UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CIV 8641

| | |
|---|---|
| LAWRENCE CHAYT, on behalf of himself and all others similarly situated,<br><br><br>Plaintiff,<br><br>vs.<br><br>SEMTECH CORP., JOHN D. POE, JASON L. CARLSON, MOHAN R. MAHESWARAN, DAVID G. FRANZ, JR., and JOHN M. BAUMANN,<br><br>Defendants. | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br>**JURY TRIAL DEMANDED** |



## CLASS ACTION COMPLAINT

Plaintiff Lawrence Chayt, individually, and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Semtech Corporation ("Semtech", or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf o f all persons and entities, other than

defendants, who purchased or acquired the securities of Semtech from September 11, 2002 until

July 19, 2006, inclusive (the "Class Period") and who were economically damaged.  The Action

seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* (the

"Exchange Act").  Throughout the Class Period, defendants engaged in a fraudulent scheme

and/or published a series of materially false and misleading statements that defendants knew,

and/or were severely reckless in not knowing, were materially false and misleading, and failed to

disclose material information necessary to render such statements not false and misleading.

2.      Semtech has recently admitted in SEC filings that its previously reported financial

results were artificially inflated through the improper and *intentional* backdating of Company

stock options, which was done at the direction of its former Chief Executive Officer and with the

knowing participation of its former Chief Financial Officer and Treasurer, among others in high-

level management  positions within the Company, resulting in, *inter alia*, the under-reporting of

compensation  expenses and the overstatement of Semtech's net income by $91 million for fiscal

years 1996-2006.

3.      Contrary to their many public statements claiming that options were dated and

priced as of the actual date of the grants at a price equal to the fair market value of the

Company's common stock as of the grant date, Defendants intentionally backdated the stock

options awarded to them and to other Semtech officers and directors, selecting dates on which

Semtech stock was trading at a much lower price than the actual grant date.

2

4.      "Backdating" an option grant means changing an option's grant date to an earlier date when the market price of the underlying stock was lower than on the actual date the option was granted. This practice improperly allows company officials to profit by setting the strike price of options with the benefit of hindsight instead of setting option strike prices at the then-current price. Backdating is the functional equivalent of using today's Wall Street Journal to buy or sell stocks based on yesterday's trading prices. Through this scheme, Defendants provided themselves with direct undisclosed compensation that came at the direct expense of Semtech's investors.

5.      In addition to lying about the manner in which Semtech granted and priced options, defendants failed to comply with Generally Accepted Accounting Principles ("GAAP") governing the expensing of stock option grants. Under applicable accounting rules, the amount by which a stock option is "in the money" at the time of grant must be recorded as compensation expense. Under APB 25, which applied to Semtech's disclosures through 2005, Semtech opted to report stock option cost by applying the "intrinsic value method." Applying this method, a stock has "intrinsic value" when a company grants options at a strike price that was below the value of the underlying stock on the day of grant. If a stock option has "intrinsic value," the issuing company is required to recognize the difference in value as an amortization expense on its financial statements. The Company failed to record, as a compensation expense, the difference between the price of Semtech's stock on the date of the actual grant and the "backdated" exercise price of the options, leading to an understatement of compensation expense and an overstatement of its reported income. As a result, Semtech's Class Period financial statements did not accurately present the Company's results and deceived investors.

6.    Defendants' improper options practices first came to light on May 16, 2006, when the Center for Financial Research and Analysis ("CFRA") published a research report on stock option backdating that listed Semtech as a company at risk for such practices. The report was followed by an SEC inquiry and a grand jury investigation led by the U.S. Attorney for the Southern District of New York. After conducting an internal investigation, the Company *admitted* that certain of Semtech's most senior officers, including the former Chairman and CEO, the CFO and the Treasurer *intentionally backdated stock options.* Semtech was forced to restate its historical financial statements by $91 million.

7.    As news of Semtech's backdating woes began to be disclosed, the Company's stock price reacted strongly. On May 19, 2006, the day prior to the Company's announcement of the SEC inquiry, the Company's stock price closed at $16.05 per share. The next trading day, the Company's stock price closed at $15.36 on May 22, 2006 on very heavy volume of over 1.2 million shares traded, even as the Company attempted to downplay of the significance of the "informal" inquiry. On May 23, 2006 the stock once again closed down at $15.27 on volume of over 1.3 million shares traded.

8.    The stock price continued its downward move on each successive announcement concerning Semtech's backdating scheme, closing at $14.90 on June 13, 2006, down from the prior day's close of $15.12; closing at $14.60 on June 15, 2006, on very heavy volume of over 2.3 million shares traded; closing at $14.40 on June 16, 2006 on volume of over 2.1 million; and closing at $14.26 on June 19, 2006.

9.    On July 19, 2006, the last day of the Class Period, the Company revealed that it expected to record material amounts of additional compensation expense and restate its financial

4

results from fiscal 2002 through 2006, and that its prior financial statements should not be relied upon. Semtech's stock price continued to drop on the announcement, closing at $13.19 on July 19, 2006 and down sharply on July 20, 2006 to close at $12.37.

10.     Defendants' scheme deceived the investing public regarding Semtech's business, operations, management and the intrinsic value of Semtech securities. In reliance upon the veracity of Defendants' false and misleading statements, Plaintiff and the other members of the Class purchased shares of Semtech stock at artificially inflated prices and were injured after the truth emerged and the value of Semtech shares declined.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), and because the grand jury investigation into defendants' stock option manipulation is being conducted by the U.S. Attorney for the Southern District of New York, and is currently ongoing in this District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

15.     As set forth in the accompanying certification, incorporated by reference herein and attached as Exhibit A, Plaintiff Lawrence Chayt purchased Semtech common stock at artificially inflated prices during the Class period and was damaged economically by Defendants' wrongdoing.

16.     Defendant Semtech is a Delaware corporation with its headquarters at 200 Flynn Road, Camarillo, California, 93012-8790. Semtech describes itself as "a leading supplier of analog and mixed-signal semiconductor products." The Company's stock is publicly traded on NASDAQ under the ticker symbol "SMTC."

17.     Defendant John D. Poe ("Poe") became Semtech's Chairman of the Board in 1998. Poe also served as Chief Executive Officer ("CEO") of the Company from October 1985 to October 2003 and as interim CEO from September 2005 to April 2006. On August 17, 2006, he stepped down from his position as Chairman, taking a leave of absence while the Board investigated the Company's stock options accounting. On October 23, 2006, at the request of a Special Committee of the Board, Poe resigned as Chairman. On April 16, 2007, Poe left the Company completely, resigning from Semtech's Board of Directors. While employed by Semtech and while serving on the Company's Board, Defendant Poe directly participated in, approved, and concealed the backdated options scheme at issue in this case, and assisted in the preparation of Semtech's proxy statements, and its quarterly and annual reports since the start of the Class Period. He also signed the Company's Forms 10-Q and 10-K and the Certifications

contained therein, as well as the Company's proxy statements. During the Class Period,

Defendant Poe sold 812,122 shares of Semtech stock for proceeds of $17.98 million, with

knowledge of the options backdating scheme described herein.

18.     Defendant Jason L. Carlson ("Carlson") served as CEO and as a director of

Semtech from October 2003 to October 2005. While serving as the Company's CEO, Carlson

signed the Company's Forms 10-Q and 10-K and the Certifications contained therein,

notwithstanding the fact that those SEC filings contained materially misleading statements

regarding the Company's finances and compliance with Generally Accepted Accounting

Principles.

19.     Defendant Mohan R. Maheswaran ("Maheswaran") has served as President, CEO,

and as a director since 2006. While serving as the Company's CEO, Maheswaran signed the

Company's Form 10-K dated April 16, 2006 and the Certifications contained therein,

notwithstanding the fact that the SEC filing contained materially misleading statements

regarding the Company's finances and compliance with Generally Accepted Accounting

Principles.

20.     Defendant David G. Franz Jr. ("Franz") served as Semtech's Vice President of

Finance and Chief Financial Officer ("CFO") from 1993 to 2006. Franz' employment with the

Company terminated on January 22, 2007. While employed by Semtech and while serving on

the Company's board, Defendant Franz directly participated in, approved, and concealed the

backdated options scheme at issue in this case, and assisted in the preparation of Semtech's

proxy statements, and its quarterly and annual reports since the start of the class period. He also

signed all of the Company's Forms 10-Q and 10-K and the Certifications contained therein.

During the Class Period, Franz sold 132,000 shares of Semtech stock for proceeds of $2.9 million, with knowledge o f the options backdating scheme described herein.

21.    Defendant John M. Baumann ("Baumann") served as Semtech's Treasurer beginning in 1994, until his employment was terminated on January 31, 2007. Defendant Baumann directly participated in, approved, and concealed the backdated options scheme at issue in this case, and assisted in the preparation of Semtech's proxy statements, and its quarterly and annual reports. During the Class Period, Baumann sold 35,000 shares of Semtech stock for proceeds in excess of $728,000, with knowledge of the options backdating scheme described herein.

22.    Defendants Poe, Carlson, Maheswaran; Franz and Baumann are collectively referred to as the "Individual Defendants."

23.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, compensation practices, operations, operational trends, financial statements, markets and present and future business prospects by means of access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto) available to them, and conversations and connections with other corporate officers and employees. With respect to all Individual Defendants, they had access to the adverse undisclosed information about the Company's business, compensation practices, operations, operational trends, financial statements, markets and present and future business prospects through, among other things, their attendance at management and Board meetings and meetings

of their respective board committees and through reports and other information provided to them in connection therewith.

24.    Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  The Individual Defendants, because of their positions of control and authority as officers of Semtech, were involved in drafting, producing, reviewing, approving and/or disseminating communications with the public and the false and misleading statements and information alleged herein, knew, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.  Each had the ability and/or opportunity to prevent the issuance of the misstatements or cause the misstatements to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the misrepresentations contained therein.

25.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ National Market, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially

misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Semtech common stock by disseminating materially false and misleading statements and/or concealing material adverse facts with respect to the statements concerning stock options challenged herein. The scheme: (i) deceived the investing public regarding Semtech's business, operations, management and the intrinsic value of Semtech common stock; (ii) permitted the Individual Defendants to receive substantial amounts of compensation disguised as "risk-based;" and (iii) caused Plaintiff and other members of the Class to purchase Semtech common stock at artificially inflated prices.

27.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various statements complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions there from, and were aware of their materially false and misleading nature with respect to the statements concerning stock options challenged herein. Because of their position with the Company each of the Individual Defendants had access to the adverse undisclosed in formation about Semtech's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations, made by or about Semtech and its business, issued or adopted by the Company, materially false and misleading.

## CLASS ACTION ALLEGATIONS

28.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or acquired the securities of Semtech from September 11, 2002 to July 19, 2006, inclusive, and who were economically damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, members of the immediate families of any excluded person, the legal representatives, heirs, successors or assigns of any excluded person, and any entity in which defendants have or had a controlling interest.

29.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Semtech had over 72 million shares of common stock issued and outstanding and actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, record owners and other members of the Class may be identified from records maintained by Semtech or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.    Plaintiff's claims are typical of the claims of the members of the Class as all members were similarly impacted by the wrongful conduct complained of herein.

31.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

11

32.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether defendants' acts violated the federal securities laws;

(b)    Whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Semtech; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

33.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Stock Option Grants

34.    A stock option allows the recipient to purchase a specific number of shares at a preset price. Public companies like Semtech typically grant stock options as part of their executive compensation. After options are granted as incentive compensation, if the market price of the company's stock has increased since the date of the grant, the executive will

typically be able to enjoy economic benefits in line with the benefits that shareholders experience by virtue of the company's (and the executive's) performance.

35.    When a company grants an employee or director stock options, it must do so under a written stock option plan filed with the SEC and disclosed to the public. This is so because potential gains, such as the one described above, are a form of risk based compensation and, therefore, may have an impact on, among other things, the company's compensation expense, earnings per share, and net income.

36.    Under accounting rules in effect prior to approximately 2006, public companies in the United States were permitted to grant stock options to employees without recording an expense as long as the options' strike price was *at or above* the market's closing price for the stock on the day the options were granted. However, if the option granted was priced *below* the market price on the date granted, known as an "in the money" options grant, accounting rules requited that any publicly traded company recognize and record the difference as a compensation expense in their financial statements. *See* Accounting Principles Board Opinion No. 25 ("APB No. 25"), superseded as of December 31, 2005 by FAS 123(R). Accounting rules also require that companies recognize the same compensation expense if "in the money" options were granted to non-employees. Thus while "in the money" stock options are more valuable to those to whom they are granted, the additional expenses, if reported, would reduce the total amount of net income and earnings per share reported to shareholders of a publicly traded company. The consequence of a company's improper accounting for option grants is that investors will not have an accurate picture of the company's financial position.

**APB No. 23**

37.    In effect through December 31, 2005, APB 25 required a company to recognize compensation expense for options granted with an exercise price that was less than the market price on the date of grant, *i.e.*, an "in the money" option. If an option was issued at an exercise price equal to the extant market price on the date of grant (*i.e.*, "at the money"), no compensation expense needed to be recorded.

38.    When an option is "in the money" on the date of grant, (*i.e.*, the market price of the stock exceeds the option's exercise price on the date of grant), compensation cost is calculated by multiplying the total number of options granted by the difference between the exercise price of the option and the market price of the stock on the date of grant.  Compensation cost is then amortized and recognized as an expense over the option's vesting period.

39.    Failure to properly account for in the money option grants results in the misstatement of a company's financials, since the extent to which the fair market value of a security exceeds the exercise price on the date of grant is compensation to the option recipient and must be accounted for as a cost to the corporation.  A company that fails to record and properly amortize the intrinsic value of an in the money option grant understates compensation cost and overstates net income in the year of grant, and, in each year thereafter, until the option is fully vested.

40.    The SEC has adopted the view that failure to properly account for backdated options violates securities laws when companies fail to record as compensation expense the amount by which the option grants were actually "in the money" at the time that the grant was awarded.  In a complaint filed by the SEC against Peregrine Systems, Inc. in June 2003, the SEC

alleged that Peregrine's option plan administrator used a "look back" process between quarterly

board meetings to identify the day with the lowest stock price over the interval and then declared

this date to be the grant date. The SEC viewed this as a forth of financial fraud because it

resulted in the understatement of compensation expenses. Specifically, the SEC stated that

"[u]nder the applicable accounting rules, any positive difference in the stock price between the

exercise price and that on the measurement date ... had to be accounted for as compensation

expense. By failing to record the compensation expense, Peregrine understated its expenses by

approximately $90 million." This, essentially, is what defendants have done here, except that

Semtech overstated its net income by over $91 million as a result of the scheme.

**The Company's Stock Option Plans and By Laws**

41.    Semtech granted stock options pursuant to several stock option plans: the 1986

Stock Option Plan enacted February 1986, the 1987 Stock Option Plan enacted February 1987,

the 1994 Long-Term Stock Incentive Plan and the 1994 Non-Employee Directors Stock Option

Plan.

42.    Semtech amended and consolidated its 1986 and 1987 Stock Option Plans, the

1994 Long-Term Stock Incentive Plan, and the 1994 Non-Employee Directors Stock Option Plan

into the Long-Term Stock Incentive Plan in 1999. According to the terms of the Long-Term

Stock Incentive Plan, "(f)or Plan purposes, all stock options . . . shall have an exercise price

which shall reflect the average traded price of a share of Common Stock, on the date as

determined by the Plan Administrator, . . . The application date shall be the date an which the

award is granted."

43.     The Company stated in each of its Class Period Annual Reports filed with the

SEC that its stock option grants were made pursuant to its stock option plan, at a price at least

equal to the fair market value of the Company's common stock on the date of the grant.  For

example, Semtech's 2003 Annual Report filed with the SEC on April 24, 2003, states at Note 12:

> The company has various stock option plans that provide for
> granting options to purchase shares of the Company's common
> stock to employees, directors and consultants of the Company. The
> plans provide for the granting of options which meet the Internal
> Revenue Code qualifications to be incentive, stock options, as well
> as non statutory options.  Under these plans, the option price ***must
> be at least equal to the fair market value of the Company's
> common stock at the date of the grant for incentive stack options***.
> . . .

44.     Semtech's Proxy Statements filed with the SEC also separately asserted that

particular stock option grants to the Company's executives occurred ***"with an exercise price at***

***fair market value as of the date of the grant."***

45.     Pursuant to the Company's By-Laws, the Board to Directors or Compensation

Committee had the authority to grant stock options either without a formal meeting if ail

members of the Board of Committee consented in writing; to the adoption o£ a resolution

authorizing the action by "unanimous written consent," or alternatively, the Board or

Compensation Committee could act by holding a meeting at which a quorum of the Board or

Committee members is present, if a majority of those present at the meeting approve the action.

**The Stock Options Backdating Scandal**

46.     In the spring of 2006, many public corporations came under scrutiny for

backdating stock option grants.  At that time, major news publications began reporting that

employees of public companies received well-timed option grants in frequencies that could not

be explained by luck alone; statistically, the likelihood that the grants were arbitrarily timed was

astronomically small.  More than 140 companies have been implicated, leading to regulatory

investigations, indictments, and restatements.

47.    On May 6, 2006, The Wall Street Journal published an article by reporters

Charles Forelle and James Bandler, reporting on the evolving options backdating crisis:

> **Backdating Probe Widens as 2 Quit Silicon Valley Firm -- Power
> Integrations Officials Leave Amid Options Scandal; 10 Companies
> Involved So Far**
>
> (Copyright (c) 2006, Dow Jones & Company, Inc.)
>
> The stock-options backdating scandal continued to intensify, with
> the announcement by a Silicon Valley chip maker that its
> chairman and its chief financial officer had abruptly resigned.
> That brought to eight the number of officials at various
> companies to leave their posts amid scrutiny of how companies
> grant stock options.
>
> Power Integrations Inc., of San Jose, Calif., said Chairman
> Howard Earhart, who is a former chief executive, and finance
> chief John Cobb had resigned.  It also said it probably will need
> to restate nearly seven years of financial results because of
> options-granting problems.

48.    The article further explained that acknowledgments by companies that backdating

occurred sparked internal investigations at other companies, drawing the attention of the SEC,

federal prosecutors and investors:

> So far, at least 10 companies have been caught up in the stock-
> options-dating matter, with several already in effect
> acknowledging that some improper dating occurred. A number of
> companies are conducting their own investigations or are the
> subjects of Securities and Exchange Commission probes. In one
> case, company practices have attracted the attention of federal
> prosecutors examining possible fraud violations.

The matter also is drawing concern from investors, who have bid down the stock prices of some of the companies caught up in the various probes.

. . .

49.    The article also focused on the dubious statistical likelihood of consistently sharp price increases following the granting of options, similar to those alleged herein, and stated that such patterns "raise questions about whether there has been backdating or other gaming of the system."

UnitedHealth, Comverse Technology Inc. and Vitesse were among six companies whose options practices were examined in a March article in The Wall Street Journal. *The article found that the CEOs of the companies routinely received grants dated ahead of sharp rises in share price, and that the likelihood of those beneficial grant dates having occurred randomly was minute.* All six companies have since said they've begun probes by outside directors and lawyers into their granting practices.

[…]

Typically, stock options are granted by boards of directors. They are generally supposed to carry exercise prices equal to the fair market value of the company's stock at the time of the grant. But at a number of companies, grants to top executives show an unusual pattern. *They're frequently dated fast before [a] sharp rise in the share price, and at or near the bottom of a steep dip. The patterns, statistically unlikely, raise questions about whether there has been backdating; or other gaming of the system.*

[…]

The SEC began examining options backdating more than a year ago. Its attention apparently was piqued by *academic research that found unusual patterns of stock activity around the time of options grants, suggestive of possible backdating.* The research indicates that a dating problem could go beyond the cluster o f companies already under scrutiny.

(emphasis added.)

18

50.     The *Journal* also reported that several of the option granting investigations had led companies to announce restatements and to the suspension of corporate executives:

> Both Power Integrations and Comverse, a New York maker of telecommunications software, have said their reviews indicate that some options grants carried dates that "differed' from the grants' actual dates.
>
> Both companies, whose reviews continue, said they expect to *restate* financial results to record "additional noncash charges."

51.     Arthur Levitt, former Chairman of the SEC, recently described this backdating scheme in the bluntest possible terms: Backdating "represents the ultimate in greed... It is stealing, in effect.  It is ripping off shareholders in an unconscionable way."  Charles Forelle and James Handler, "Five More Companies Show Questionable Options Pattern," *The Wall Street Journal*, May 22, 2006.

52.     In testimony before the U.S. Committee on Banking, Housing, and Urban Affairs on September 6, 2006, SEC Chairman Christopher Cox explained why options backdating schemes are so harmful:

> This issue is one of intense public interest because it strikes at the heart of the relationship among a public company's management, its directors, and its shareholders.
>
> [. . .]
>
> The purpose of disguising an in-the-money option through backdating is to allow the person who gets the option grant to realize larger potential gains -- without the company having to show it as compensation on the financial statements.
>
> Rather obviously, this fact pattern results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws.
>
> [. . .]

> They involve actual personal gain to wrongdoers, and real harm to companies that failed to properly account for the options practices....

Remarks of Chairman Cox, available at http://www.sec.gov/news/testimony/

2006/ts090606cc.htm.

## Defendants' Improper Stock Option Granting Practices

53.    Semtech has **admitted** that certain of its most senior executives intentionally

backdated stock options between fiscal years 1996 through 2002.  As a result, Semtech's

financial statements from fiscal 2002 through 2006 were materially misstated.

54.    Defendants failed to comply with APB 25, the Generally Accepted Accounting

Principle governing the reporting of stock-based compensation expense and, thus, Semtech's

Class Period financial statements materially misrepresented, among other financial metrics, the

Company's measure of net income.

55.    Additionally, the Company and the Individual Defendants' practice of improperly

granting executive and director stock options demonstrates that their statements regarding the

stock option granting process, and the associated accounting, contained in Semtech's financial

reports filed with the SEC were materially false and misleading.

56.    For instance, Semtech's Class Period financial reports created the false

impression that Defendants chose the grant dates for the options based on arbitrary or

administrative factors, rather than, as was in fact the case, a calculation of what would most

increase the likelihood of maximum gain for the executives and directors, maximize the cost to

the corporation, and substantially diminish the risk associated with Semtech common stack for these option recipients compared with ordinary investors in Semtech common stock.

57.    Defendants represented in Semtech's financial reports before and throughout the Class Period that the exercise price of options granted under Semtech's stock option plans would not be less than the fair market value of the common stock on the date the option was granted, in the case of incentive stock options. (That is, Semtech would not grant "in the money" incentive options.) By omitting any reference to the opportunistic practices of the Company and the Individual Defendants, these statements misleadingly implied that the risk and uncertainty associated with the options was the same faced by any other shareholder who bought Semtech common stock at current fair market prices, when, in fact, the deck had been stacked for management by substantially reducing any such risk, based on an insider perspective of the current and prospective fortunes of the Company and the likely movement of its stock price.

58.    By intentionally manipulating and falsifying the timing of stock option grants to themselves and other officers and directors and the timing of the pubic disclosure of material information, defendants received undeserved and unearned hidden direct compensation at the expense of shareholders.

59.    Moreover, pursuant to APB 25, since Defendants' backdated option grants were "in the money" at the time of grant, Defendants had an obligation to record the difference between the market price of Semtech stock at the time of grant and the exercise price of the option as compensation expense. Defendants intentionally failed to do so, resulting in a significant overstatement of Semtech's income and massive investor losses.

**Defendants' Violations of Generally Accepted Accounting Principals and SEC Regulations**

60.    Defendants' options backdating scheme constituted knowing and willful violations of both GAAP and SEC Regulations for the proper reporting of its earnings.

61.    According to SEC regulations, public companies must prepare their financial statements in accordance with GAAP.

62.    GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. They are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board, and the Financial Accounting Standards Board {"FASB") with the permission of the SEC (Accounting Series Release 150).

63.    SEC Rule 4-01(a) of SEC Regulation S-X requires that "[f]inancial statements bled with the Commission which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided." 17 C.F.R. § 210.4-01(a) (i).

64.    Regulation S-X also requires that interim financial statements must comply with GAAP. 17 C.F.R. 5 210.10-01(a).

65.    As noted in AICPA auditing standard ("AU"), § 110.02, a public company's management is responsible for preparing financial statements in conformity with GAAP:

> The financial statements are management's responsibility ...
> Management is responsible for adopting sound accounting policies
> and for establishing and maintaining internal controls that will,
> among other things, initiate, record, process, and report
> transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements. The
> entity's transactions and the related assets, liabilities and equity are
> within the direct knowledge and control of management.... Thus,
> the fair presentation of uncial statements in conformity with
> generally accepted accounting principles is an implicit and integral
> part of management's responsibility.

66.     Throughout the Class Period, Defendants intentionally violated, ignored or failed

to adopt sound accounting policies and to maintain internal controls designed to ensure that the

Company's public filings were fairly presented.

67.     The SEC also regulates statements by companies "that can reasonably be

expected to reach investors and the trading markets, whoever the intended primary audience."

Public Statements by Corporate Representatives, Exchange Act Release No. 33-6504, 3 Fed.

Sec. L. Rep. (CCII) ¶ 23,120B, at 17,096, 17 C.F.R. § 241.20560, 1984 WL 126134 (Jan. 13,

1984).

68.     Under SEC regulations, the management of a public company has a duty "to make

full and prompt announcements of material facts regarding the company's financial condition."

Timely Disclosure of Material Corporate Developments, Exchange Act Release No, 34-8995, 3

Fed. Sec. L. Rep. (CCTI) ¶ 23,120A, at 17,095, 17 C.F.R. 5 241.8995, 1970 \Y/L 10576 (Oct.

15, 1970). Defendants violated this regulation throughout the Class Period by deliberately and/or

recklessly misrepresenting the specific terms and the annual costs of the Company's employee

and director stock plans.

69.    In Securities Act Release No. 6349, 23 S.E.C. Docket 962 (Sept. 28, 1981), the SEC stated that "[I]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

70.    Defendants violated this fundamental responsibility by distorting the public's understanding of material facts relating to Semtech's employee compensation expenses, *to wit*, the costs the Company would have incurred had it properly accounted fox stock options that defendants improperly backdated; and by concealing the fact that the options granted to executives and directors of the Company appeared, were a disguised form of direct compensation, which should have reduced the Company's net income.

71.    Accordingly, throughout the Class Period Defendants' affirmatively misrepresented Semtech's business and financial condition in violation of applicable SEC rules and regulations.

72.    Semtech's options accounting also violated the following fundamental principles of GAAP, *to wit*:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (FASB Statement of Financial Accounting Concepts ("FASCON") No. 1);

(b)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources. (*Id.*)

24

(c)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. (*Id*);

(d)     The principle that financial reporting should provide information about an enterprise's financial performance during a certain time period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (*Id.*);

(e)     The principle that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form, (FASCON No. 2);

(f)     The principle that information should be reliable as well as relevant is a notion that is central to accounting. The reliability of a measure rests on the faithfulness with which it represents what it purports to represent. (*Id.*);

(g)     The principle of completeness, that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions. (*Id.*);

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (*Id.*); and

(i)      The principle that recognition of revenues, expenses, gains and losses and the related increments or decrements in assets and liabilities... is the essence of using accrual accounting to treasure performance of entities. (FASCON No. 6).

**Defendants Materially False and Misleading Class Period Representations**

73.      During the Class Period, the Company filed eleven quarterly reports on Form 10-Q with the SEC, between September 11, 2002 and December 9, 2405, and one amended quarterly report on Form 10-Q/A. Each of those reports set out the Company's earnings for the respective quarter. The Company also filed four annual reports with the SEC on Form 10-K for the fiscal years ending January 26, 2003, January 25, 2004, January 30, 2005 and January 29, 2006, which reported the Company's earnings on a quarterly and annual basis.

74.      The Class Period begins on August 27, 2002, when the Company filed a Form 8-K with the SEC and issued a press release announcing the Company's earnings for the quarter ending July 28, 2002. According to the Form 8-K and press release, the Company's net income for the second quarter of fiscal 2003 was $11.1 million or $.14 per diluted share. Those net income and EFS numbers were repeated in the Company's Form 10-Q for the quarter ending July 28, 2002 filed with the SEC on September 11, 2002.

75.      The August 27, 2002 press release and Form 8-K and each of the subsequent Forms 10Qs, the Form 10-Q/A and the Forms 10-K were materially false and misleading for the reasons discussed above, namely, because the reported earnings (the most fundamental measure of a company's results of operations) were materially artificially inflated by Company's improper understatement of compensation expenses that resulted from its option backdating scheme, which was undisclosed, in violation of GAAP.

76.    In addition, each of the Forms 10-Q and 10-K filed during the Class Period falsely represented that the financial information was not misleading and had been prepared in compliance with SEC regulations The Company's quarterly reports filed with the SEC on Form 10-Q and 10-Q/A between September 11, 2002, the commencement of the class period and December 10, 2003, contain the following language:

> The consolidated condensed financial statements included herein have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States have been condensed or omitted pursuant to such rules and regulations, although the Company believes that the disclosures are adequate to make the information presented not misleading. These condensed financial statements should be read in conjunction with the consolidated financial statements and notes thereto included in the Company's latest annual report on Form 10-K. In the opinion of the Company, these unaudited statements contain all adjustments (consisting of normal recurring adjustments) necessary to present fairly the financial position of Semtech Corporation and subsidiaries as of [date], and the results of their operations for the [appropriate period of time) and their cash flows for the [appropriate period of time] then ended.

77.    After December 10, 2003, the Company changed the wording of its SEC filings slightly, to read as follows:

> The accompanying consolidated condensed financial statements have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States have been condensed or omitted pursuant to such rules and regulations, although the Company believes that the disclosures are adequate to make the information presented not misleading. These consolidated condensed financial statements should be read in conjunction with the consolidated financial statements and notes thereto included in the Company's latest annual report on Form 10-

K. Certain amounts for prior periods have been reclassified to
confirm to the current presentation.

In the opinion of the Company, these unaudited statements contain
all adjustments (consisting of normal recurring adjustments)
necessary to present fairly, in all material respects, the financial
position of Semtech Corporation and subsidiaries as of (date), the
results of their operations for the [appropriate period of time], and
their cash flows for the [appropriate period of time] then ended.

78.    The Company's Forms 10-K filed during the Class Period were likewise3 false

and misleading. Beginning with the Form 10-K filed with the SEC on April 24, 2003, for the

fiscal year ending January 26, 2003, each for the Forms 10-K (and Forms 1Et-Q) falsely

represented that the Semtech accounted for its stock option grants pursuant to APB No. 25:

The Company accounts for its employee stock plan under the
intrinsic value method prescribed by Accounting Principles Board
Opinion ("APB") No. 25, "Accounting for Stock Issued to
Employees," and related interpretations, and has adopted the
disclosure-only provisions of SFAS No. 123, "Accounting for
Stock-Based Compensation" and as amended by SFAS No. 148,
"Accounting for Stock-Based Compensation -Transition and
Disclosure, and amendment of FASB Statement No. 123."

79.    In addition, beginning with the Form 10-Q dated September 11, 2002, each of the

Forms 10-Q and Forms 10-K contained certifications signed by the then-current Chief Executive

Officer and Chief Financial Officer, Franz, which falsely assured investors that the reports

accurately conveyed the Company's results of operations, that they were free from false and

misleading statements, and that the Company's disclosure controls and processes were adequate.

80.    The Form 10-Q dated September 11, 2002 was signed by Defendants Poe and

Franz, and contained the following disclosure immediately above each of their signatures:

(a)     I have reviewed this quarterly report on Form 10-Q of Semtech Corporation;

(b)     Based on my knowledge, this quarterly report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances in which they were made, not misleading with respect to the period covered by this quarterly report; and

(c)     Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report.

81.     The Forms 10-Q and 10-K filed with the SEC between December 11, 2002 and September 10, 2003, also signed by Defendants Poe and Franz, contain the following more detailed disclosures immediately above their signatures:

(a)     I have reviewed this [annual/quarterly] report  Form [14-Q/10-K] of Semtech Corporation;

(b)     Based on my knowledge, this [annual/quarterly] report does not contain any untrue statement of a material fact, or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this [annual/quarterly] report; and

(c)     Based on my knowledge, this financial statements, and other financial information included in this [annual/quarterly] report, fairly present in all material

respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this [annual/quarterly] report;

      (d)     The registrant's other certifying officers and l axe responsible for establishing and maintaining disclosure controls and procedures (as defined in the Exchange Act Rules 13a-14 and 15d14) for the registrant and we have:

      (i)     Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this [annual/quarterly] report is being prepared;

      (ii)     Evaluated the effectiveness of the registrant's disclosure controls and procedures as of the date within 90 days prior to the filing of this [annual/quarterly] report (the "Evaluation Date"); and

      (iii)     Presented in this [annual/quarterly] report our conclusions about the effectiveness of the disclosure controls and procedures based no out evaluation as of the Evaluation Date;

      (e)     The registrant's other certifying officers and l have disclosed, based on our most recent evaluation, to the registrant's auditor and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

      (i)     All significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

          (ii)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

(f)      The registrant's other certifying officers and I have indicated in this [annual /quarterly] report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

82.      Beginning with the Form 10-Q filed on June 11, 2003, the CEO and the CFO also signed and submitted Certifications pursuant to 18 USC 1354 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which stated as follows:

In connection with the Quarterly Report of Semtech Corporation (the "Company") on Form 10-Q for the period ended [date] as filed with the Securities Exchange Commission on the date hereof (the "Report"), I, [officer's name and title], hereby certify pursuant to 18 USC 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(a)      The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(b)      The information contained in the Report fairly presents, in all material respects, the financial condition of the Company.

83.    Each Form 10-Q and Form 10-K filed during the Class Period (after the June 11, 2003 Form 10-Q) contained similar Certifications signed by Defendant Franz as CFO, as well as the then current CEO.

84.    Defendant Poe served as Chief Executive Officer and executed all of the Sarbanes-Oxley Certifications until the Form 10-Q dated December 10, 2003, which was signed and certified by CEO Carlson. Carlson signed the Certifications on all Forms 10-Q and 10-K until and including the Form 10Q filed on September 9, 2005. Defendant Poe, serving as Interim CEO, signed the Certifications for the Form 10-Q filed on December 9, 2005. Defendant Maheswaran signed the Certifications as CEO for the Form 10-K filed on April 14, 2006.

85.    The Certifications were materially false and misleading at the time they were made because as stated above, the Forms 10-Q and Forms 10-K contained false and misleading financial information and failed to disclose the options backdating scheme. The Company knowingly did not account for its employee stock option giants in accordance with APB No, 25 because it failed to recognize as compensation expense the amount by which a granted option was in the money. Defendants' assurances that the reports were free from error and accurately conveyed Semtech's financial results were patently untrue and deceived investors. In addition, the Company's disclosure controls and procedures were not adequate. To the contrary, the controls were woefully inadequate, allowing the backdating scheme, and the attendant false accounting that inflated earnings by hundreds of millions of dollars, to flourish for years.

**The Truth Begins To Emerge**

86.    Defendants' scheme began to be disclosed when, on May 16, 2006, the Center for

Financial Research and Analysis ("CFRA") published a research report on stock option

backdating. The CFRA report listed Semtech as a company at risk for such practices.

87.    Following the CFRA report, on May 18, 2006, the Securities and Exchange

Commission ("SEC") sent the Company a letter requesting that it voluntarily provide

information regarding stock options granted since January 1, 1997. On May 22, 2006, the

Company issued a press release announcing that it received the SEC letter and stated that it

"intends to fully cooperate with the SEC's informal inquiry."  However, far from admitting that

the Company had engaged in improper backdating  of options, the press release attempted to

reassure investors, stating that Semtech was one of 30 companies mentioned in the report, and

noted that the report referenced only four of the Company's option grants; two in 1997, one in

1999, and one in 2002.

88.    On June 9, 2006, the company filed a Form 12b-25 with the SEC announcing that,

in addition to the SEC investigation, the Company was conducting its own internal review.

According to the filing, due to the volume of data subject to the internal review, the Company

was unable to complete and timely file its Form 10-Q for the quarter ending April 30, 2006.

89.    On June 14, 2006, the Company issued a press release announcing that the filing

of its April 30, 2006 Form 10-Q would be delayed past the extended June 14, 2006 due date, and

as a result of the delay in filing, the Company might receive a delisting notice from the

NASDAQ. The press release also announced that Semtech's Audit Committee had launched its

own internal investigation, and that on June 13, 2006, the Company received a grand jury

subpoena dated June 8, 2006 from the United States District Court for the Southern District of New York with respect to the production of documents relating to the Company's stock option practices.

90.    On June 20, 2006, the Company issued a press release announcing that it received a delisting notice from the NASDAQ due to the Company's failure to timely file its Form 10-Q for the quarter ended April 30, 2006.

91.    Early in the morning of July 20, 2006, the Company filed a Form 8-K with the SEC revealing that, even though it had only begun its internal investigation, it had already determined that "the accounting measurement dates for certain stock options granted primarily during fiscal years 1998 through 2003... differ from the measurement dates previously used for such awards" and that it expected to "record additional noncash compensation expense and **expects the amount of such additional expense to be material."**(emphasis added).

92.    The July 20, 2006 Form 8-K further revealed that, "[a]s a result of these adjustments, the Company expects to restate its financial statements for fiscal years 2002 through 2006," and that the Company's previously issued financial statements, earnings press releases and similar communications should no longer be relied upon.

93.    Semtech's stock price reacted strongly to these series of announcements about the backdating investigation. On May 19, 2006, the day prior to the Company's announcement of the SEC inquiry, the Company's stock price closed at $16.05 per share. Despite the Company's downplaying of the significance of the "informal" inquiry, the Company's stock price closed at $15.36 on May 22, 2006, on very heavy volume of over 1.2 million shares traded. On May 23, 2006 it closed down at $15.27 on volume of over 1.3 million shares traded.

94.     The stock price continued its downward move on each successive announcement,

closing at $14.90 on June 13, 2006, down from the prior day's close of $35.12; closing at $14.60

on June 15, 2006, on very heavy volume of over 2.3 million shares traded; closing at $14.40 on

June 16, 2006 on volume of over 2.1 million; and closing at $14.26 on June 19, 2006.

95.     On July 19, 2006, the last day of the Class Period, the stock price continued to

drop after the Company finally revealed it expected to record material amounts of additional

compensation expense and restate its financial results from fiscal 2002 through 2006, and that

its prior financial statements should not be relied upon. Semtech's stock price closed at $12.37

on July 20, 2006, down from the prior day's close of $13.19.

**Post-Class Period Events**

96.     In the wake of the stock option scandal, Semtech announced a series of executive

departures.

97.     On August 25, 2006, the Company issued a press release announcing that

defendant Poe had "stepped down" as the Company's chairman in the wake of the backdating

scandal.

98.     On October 25, 2006, the Company also filed a Form 8-K with the SEC

announcing that on October 23, 2006, it received a letter from defendant Poe announcing his

intention to resign from the Board.

99.     On November 8, 2006, the Company filed a Form 8-K with the SEC announcing

that defendant Franz "resigned" as the Company's CFO, and defendant Baumann "resigned" as

the Company's Treasurer.

100.    On March 29, 2007, the Company filed its Annual Report on Form 10-K./A for the

fiscal year ending January 29, 2006 with the SEC that revealed the true extent of the stock

options manipulation. According to the form 10-K/A, the Company's investigation uncovered

1,153 grants to continuing employees requiring restatement, 343 grants to new employees, 33

grants lacking evidence of approval, 83 grants modified after ratification, 68 post-termination

arrangements, and 393 pricing exceptions. All told, the options manipulations required a massive

$91 million in pre-tax stock option related adjustments.

101.    Most disconcerting was the revelation the Company's revelation that the options

manipulation was intentional.

> [T]he Special Committee concluded that *the evidence supports a finding of intentional manipulation by the former CEO* [Defendant Poe], *that a former human resources executive who was with the Company from October 1999 through May 2002 ("Former HR VP") participated in this conduct,* and that *the Chief Financial Officer ("Former CFO" and the Treasurer ("Former Treasurer') at the time the Special Committee's report was issued knew, or should have known, of the manipulation and initiated or participated in some manipulative acts.* One other executive ("Former Executive") who left the Company in early January 2007 was found to be significantly less culpable in that he evidenced a willingness to acquiesce in manipulative conduct.

Semtech, March 29, 2007 Form 10-K/A (emphasis added)

102.    The Form 10-K/A also revealed that the decision for Poe, Franz and Baumann to

"resign" was not theirs, as the Company's prior Form 8-K's implied. Instead, the Form 10-K/A

revealed that Poe and the Former HR VP declined to be interviewed by the Special Committee.

Following the Special Committee's report to the Board on October 2, 2006, the Board accepted

the recommendation of the Special Committee that the Former CEO be asked to resign, and the

former CEO was asked to immediately resign from the Board, Likewise, the Special Committee recommended that the Former CFO and Treasurer be asked to resign as well.

## LOSS CAUSATION ALLEGATIONS

103.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

104.     As detailed herein, throughout the Class Period, Defendants engaged in an intentional, deliberate, knowing and or/reckless course of conduct that was designed to, and did deceive the investing public and artificially inflate the price of Semtech securities.

105.     As a result, Plaintiff and the Class purchased Semtech securities at artificially inflated prices and were damaged economically when the price of Semtech securities dropped upon disclosure of the scheme.

## ADDITIONAL SCIENTER ALLEGATIONS

106.     Defendants, and each of them, acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company, for which they were responsible were materially false and misleading when made; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Defendants participated in the fraudulent scheme alleged herein by virtue of their receipt of information reflecting the truth regarding Semtech, their control over, and/or receipt and/or modification of Semtech's allegedly false and materially misleading

37

misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company.

107.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including Defendants.

108.    Defendants were personally motivated to commit the wrongdoing alleged herein because they intended to and did personally benefit from it.

## APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE FRAUD ON THE MARKET DOCTRINE AND/OR, FOR DEFENDANTS' OMISSIONS OF MATERIAL FACTS UNDER THE *AFFILIATED UTE* DOCTRINE

109.    At all relevant times, the market for Semtech's common stock was an efficient market for the following reasons, among others.

(a)    Semtech's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    During the Class Period, on average, hundreds of thousands of shares of Semtech stock were traded on a weekly basis, demonstrating a very active and broad market for Semtech stock and permitting a very strong presumption of an efficient market;

(c)    As a regulated issuer, Semtech filed periodic public reports with the SEC and the NASDAQ;

(d)     Semtech regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     Semtech was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f)     Numerous NASD member firms were active market-makers in Semtech stock at all times during the Class Period; and

(g)     Unexpected material news about Semtech was rapidly reflected and incorporated into the Company's stock price during the Class Period.

110.    As a result of the foregoing, the market for Semtech's shares promptly digested current information regarding Semtech from all publicly available sources and reflected such information in Semtech's stock price.  Under these circumstances, all purchasers of Semtech's shares during the Class Period suffered similar injury through their purchase of Semtech's shares at artificially inflated prices and a presumption of reliance applies.

111.    Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972) because the claims asserted herein against Defendants are primarily predicated upon the omission of material facts that defendants had a duty to disclose, namely, the existence of the backdating scheme and concealment of the Company's true method for grant accounting for options.

## NO SAFE HARBOR

112.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by one or more executive officers of Semtech who knew that those statements were false when made.

## COUNT I

### Violation Of Section 10(b) of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

113.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

114.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Semtech's shares at artificially inflated prices.  In

furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

115.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Semtech's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

116.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Semtech as specified herein.

117.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Semtech's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Semtech and its business operations and future prospects in the light of the circumstances under which they were made, not mislead-ing, as set forth more particularly herein, and engaged in transactions, practices and a course of

business which operated as a fraud and deceit upon the purchasers of Semtech's shares during the Class Period.

118.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts:  (1) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

119.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Semtech's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its shares.  As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by

deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

120.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Semtech's shares were artificially inflated during the Class Period.  In ignorance of the fact that market prices of Semtech's shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Semtech shares during the Class Period at artificially high prices and were or will be damaged thereby.

121.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Semtech's financial results, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Semtech shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

122.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

123.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

124.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II

### Violation of Section 20(a) of the Exchange Act

125.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

126.    The Individual Defendants acted as controlling persons of Semtech within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and  their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

127.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

128.    As set forth above, Semtech and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

129.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

130.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 5, 2007

Respectfully submitted,

**COHEN, MILSTEIN, HAUSFELD**
**& TOLL, P.L.L.C.**

By: *Catherine A. Torell*
Catherine A. Torell (CT-0905)
150 East 52nd Street, 30th Floor
New York, New York 10022
Tel.: 212-838-7797
Fax: 212-838-7745

Steven J. Toll,
Elizabeth S. Finberg
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C. 20005-3964
Tel.: 202-408-4600
Fax: 202-408-4699

*Counsel for Plaintiff Lawrence Chayt*

# EXHIBIT A

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, _LAWRENCE CHAYT_____, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed a class action complaint asserting securities claims against Semtech Corporation ("SMTC") and wish to join as a plaintiff retaining Cohen, Milstein, Hausfeld & Toll, P.L.L.C. as my counsel.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    My transactions in Semtech (SMTC) during the Class Period of September 11, 2002 through July 19, 2006 were as follows:

| DATE | TRANSACTION (buy/sell) | NO. OF SHARES | PRICE PER SHARE |
|------|------------------------|---------------|-----------------|
| 5/1/2006 | Buy | 400 | 18.61 |
| | | | |
| | | | |
| | | | |
| | | | |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in any action under the federal securities laws except as follows:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing true and correct.

Executed this ___1___ Day of _October_, 2007.

_Lawrence Chayt_