# Collective Bargaining Agreement



**1199 SEIU**

New York's Health & Human Service Union

Greater New York Health Care Facilities Association, Inc.

# COLLECTIVE BARGAINING

*Agreement*

*by and between*

**Greater New York Health Care
Facilities Association, Inc.**

*and*



*Paraprofessional Unit*

**June 1, 2004 through April 30, 2008**

# TABLE OF CONTENTS

**Article**                                                                    **Page**

1.   Bargaining Unit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
2.   Union Security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
3.   Probationary Period . . . . . . . . . . . . . . . . . . . . . . . .7
4.   Discharge and Discipline . . . . . . . . . . . . . . . . . . . .8
5.   No Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . .8
6.   Union Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
     A.  Visitation . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
     B.  Bulletin Board . . . . . . . . . . . . . . . . . . . . . . . .8
     C.  Election of Delegates . . . . . . . . . . . . . . . . . .9
7.   Seniority/Job Protection . . . . . . . . . . . . . . . . . . .9
8.   No Strike or Lockout . . . . . . . . . . . . . . . . . . . . . .11
9.   Grievance Procedure . . . . . . . . . . . . . . . . . . . . . .12
10.  Work Week . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
11.  Agency Employees, Temporary Employees,
     Staffing Schedules, Slotted and Non-Slotted
     Employees (Permanent and Replacement
     Employees) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
12.  Wage Increases . . . . . . . . . . . . . . . . . . . . . . . . . . .20
13.  Minimum Rates of Pay . . . . . . . . . . . . . . . . . . . . .21
14.  Shift Differential . . . . . . . . . . . . . . . . . . . . . . . . .22
15.  Meals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
16.  Holidays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
17.  Vacations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
18.  Leaves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
     A.  Sick Leave . . . . . . . . . . . . . . . . . . . . . . . . . .24
     B.  Leave of Absence . . . . . . . . . . . . . . . . . . . . .25
     C.  Maternity Leave . . . . . . . . . . . . . . . . . . . . . .25
     D.  Bereavement Leave . . . . . . . . . . . . . . . . . . .25
     E.  Paternity Leave . . . . . . . . . . . . . . . . . . . . . .25
     F.  Leave for Marriage . . . . . . . . . . . . . . . . . . .25
     G.  Leave for Jury Duty . . . . . . . . . . . . . . . . . . .26
     H.  Educational Leave . . . . . . . . . . . . . . . . . . . .26
19.  Uniforms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26
20.  Maintenance of Standards . . . . . . . . . . . . . . . . . .26
21.  Disability Benefits . . . . . . . . . . . . . . . . . . . . . . . .27
22.  Miscellaneous Employee Benefits . . . . . . . . . . . .27

COLLECTIVE BARGAINING AGREEMENT                    5

| 23. | Benefit Fund | 27 |
| 24. | Pension Fund | 28 |
| 25. | Education Fund | 29 |
| 26. | Job Security Fund | 30. |
| 27. | Worker Participation Fund | 31 |
| 28. | Child Care Fund | 32 |
| 29. | Fund Contributions and Contribution Rates | 33 |
| 30. | Pension and Health Benefits | 37 |
| 31. | Credit Union | 38 |
| 32. | Severance | 38 |
| 33. | Contracting Out | 38 |
| 34. | Check-off Authorization | 38 |
| 35. | Separability | 39 |
| 36. | Successors | 39 |
| 37. | Industry Standards Clause | 39 |
| 38. | Reimbursement Clause | 40 |
| 39. | Most Favored Nation Clause | 40 |
| 40. | Management Rights | 41 |
| 41. | Resignation From the Association | 41 |
| 42. | Duration | 41 |
| 43. | Ratification | 42 |
| | Schedule A | 43 |
| | Schedule B | 44 |
| | Schedule C | 46 |
| | Attachment A | 48 |
| | Attachment B – Quality of Care Committee | 49 |
| | Attachment C – Side Letter re: Scholarships | 51 |
| | Attachment D | 52 |
| | Attachment E | 55 |
| | Attachment F | 57 |

**AGREEMENT** made as of the 4th day of June, 2004 by and between NEW YORK'S HEALTH & HUMAN SERVICE UNION, 1199SEIU, AFL-CIO (hereinafter referred to as the "Union") on behalf of itself and its members in the bargaining unit (hereinafter referred to as the "Employees") now employed or hereafter to be employed by residential health care facility members of the GREATER NEW YORK HEALTH CARE FACILITIES ASSOCIA-TION, INC. (formerly known as the Metropolitan New York Nursing Home Association, Inc.) (hereinafter referred to as the "Association") and the Association on behalf of itself and those of its present members and those hereafter becoming members, who have authorized or shall authorize the making of this Agreement (such members hereinafter being referred to as the "Employers") (See Schedule "A" for a listing of the Employers).

## WITNESSETH:

WHEREAS, the Association is a membership corporation consisting of Employers engaged in the ownership and/or operation of residential health care facilities; and

WHEREAS, the Union has been designated by the majority of the Employees of the Employers in the bargaining unit as their sole collective bargaining agent with respect of wages, hours and other conditions of employment; and

WHEREAS, the Association and the Union are committed to working together to maintain and improve the ability of the Employers to provide quality health care through joint labor-management efforts; to insure appropriate funding and resources for health care through joint legislative work; and to insure that there is affordable health care and access to long term residential health care for the residents of the State of New York; and

WHEREAS, it is recognized that the efficient and orderly method of establishing and maintaining peaceful and harmonious labor relations and of dealing with the problems and controversies arising out of employment is through negotiations and agreement, rather than through strikes and lockouts; and

WHEREAS, the Association and the Union recognize that labor strife will have a disruptive influence on their ability to engage in the foregoing efforts; and

WHEREAS, the contracting parties are desirous of maintaining and promoting the highest standards of service and labor unity;

NOW, THEREFORE, in consideration of the mutual promises herein contained, the parties agree as follows:

## 1. BARGAINING UNIT

**A. Recognition and Description of Bargaining Unit:** The Association recognizes the Union as the exclusive bargaining agent for all regular full and part-time Employees (including recreation Employees) listed in the classifications in Schedule "B" attached hereto, as supplemented by custom, usage, and practice, and excluding professional, confidential employees and supervisory employees. In the event any dispute arises as to whether or not an Employee does in fact come within one of the excluded categories abovementioned, such dispute shall be submitted to arbitration for settlement and determination in the manner hereinafter provided. No supervisory employee shall regularly perform bargaining unit work except for the purposes of instruction or, in an emergency. All Employees employed for longer than thirty (30) days shall be considered regular Employees and shall be included in the unit.

**B. Additions to Bargaining Unit, Neutrality and Card Count:** The existing procedures in the Schedule B footnote with respect to additions to the bargaining unit shall remain in effect, i.e., such additions may occur upon the Union's demonstration through a card count by the Impartial Chairman that it represents a majority of Employees heretofore unrepresented by it employed by any Employer member of the Association. Upon such a showing, such Employees shall thereafter be covered by all the terms and conditions of the collective bargaining agreement. These procedures shall also apply to any new or additional facility under an Employer's direction and control. The Employers shall remain neutral with respect to the decision of non-Union Employees to seek 1199 representation. The Employers shall not hold group or one-on-one captive audience meetings concerning Union representation. The Impartial Chairman shall have the power to enforce these provisions and to remedy any breaches thereof. In addition, if the Union claims that a classification is an accretion to its existing unit, the Impartial Chairman shall determine the unit status of the classification. In doing so, the Impartial Chairman may look to custom, usage and practice, as well as NLRB unit rules.

## 2. UNION SECURITY

A. The Employers shall, throughout the term of this Agreement, employ in the bargaining unit only members of the Union in good standing, except for the first thirty (30) days of employment or the first thirty (30) days after the effective date of this Agreement, whichever is later. All new Employees hereafter employed in the bargaining unit must become members of the Union thirty (30) days after commencing their employment.

B. The Union agrees to accept such new workers for membership without discrimination.

C. Written notice from the Union to any Employer stating that an Employee is no longer a member of the Union in good standing shall be conclusive upon the Employer who shall upon one (1) week's written notice from the Union, discharge such Employee. The Union agrees to indemnify and hold the Employer harmless against any damages or expenses incurred by reason of discharge effected at the request of the Union.

D. The Employers recognize the right of the Union to elect Shop Delegates and Shop Committees to take up with the Employers, at reasonable times, the various problems that might arise at the place of employment.

E. The Employer shall forthwith give the Union a list of Employees covered by this Agreement including categories and wages and shall thereafter furnish the names, categories and wages of any new Employees in the bargaining unit within thirty (30) days after hire.

## 3. PROBATIONARY PERIOD

A. New Employees shall be deemed probationary during the first thirty (30) calendar days of their employment, during which time they may be discharged for any reason which need not be stated by the Employer.

B. Once having been employed, an Employee who is again hired more than thirty (30) calendar days after his or her first employment shall be deemed to have completed his or her probationary period and must then become a Union member, provided, however, that where there is a gap of ninety (90) days or more between the time the Employee last worked for the Employer and the date of his or her rehire (leave time excluded), then upon such rehiring the Employee shall be deemed a new Employee and the probationary period will commence anew.

Case 1:07-cv-08652-PAC   Document 1-2   Filed 10/05/2007   Page 6 of 49

## 4. DISCHARGE AND DISCIPLINE

### A. Just Cause Discharge:

Upon the conclusion of his or her probationary period, no Employee shall be discharged or disciplined, except for justifiable cause. No Employee shall be discharged prior to written notice from the Employer to the Union and the Shop Delegate.

### B. Patient Abuse Discipline:

The Employers shall conduct patient abuse investigations in an expeditious manner. While it is the Union's position that no Employee should be suspended without pay pending investigation, but should instead be maintained in their current position or reassigned to non-patient care duties with pay, in the event an Employer does suspend an Employee pending investigation the parties agree that it shall not do so for more than four (4) days, excluding Saturdays, Sundays and holidays. In the event the Employer's investigation cannot be completed within four (4) days due to the unavailability of a witness, then the Employer can continue the suspension for up to three (3) additional days, excluding Saturdays, Sundays, holidays. If the investigation is still not complete, the Employer may request permission to extend the suspension, but cannot do so unless permission is granted by the Union. The Employee may utilize any accrued paid time, i.e., vacation days and holidays. In the event the Employer determines that the Employee did not engage in any wrongful act, then the Employee shall be fully compensated for all lost wages and/or any accrued paid time used. This provision shall not be deemed a waiver of any rights under the grievance and arbitration provisions.

## 5. NO DISCRIMINATION

The opportunity to give and obtain employment without discrimination because of race, creed, color, handicap, sex, national origin or age to the extent prohibited by law is hereby recognized by the parties to this Agreement.

## 6. UNION RIGHTS

### A. Visitation:

The representative of the Union servicing the facility, or the Union's designee, shall have admission to all properties covered by this Agreement to discharge his or her duties as representative of the Union. No Employee may be called off his or her station by the Union representative without the Employer's consent, which consent shall not be unreasonably withheld; the Employer shall arrange to relieve the affected Employee upon the request of the Union representative.

### B. Bulletin Board:

The Employer shall make available to the Union in the nursing home a bulletin board for the purpose of posting Union notices.

### C. Election of Delegates:

The Union shall advise the Employer of the names of the Delegates elected to serve in that office and the names of their successors, if any. Delegates shall be given reasonable opportunity without loss of pay to handle grievances, attend arbitrations and perform other necessary functions in connection with their office.

### D.

The parties recognize that the Union's Delegates will play a pivotal role in educating the Union membership in understanding the cost savings program contemplated in this Agreement, in helping to prevent fraud and abuse in the Funds, and in understanding this Agreement and the collective bargaining process. In this regard, the Delegates will be released for up to five (5) days with pay over the term of this Agreement for intensive training in these areas. The release of Delegates shall not unreasonably interfere with the operations of the Employer. The Employers will be reimbursed from the Worker Participation Fund for the cost of release time (approximately $1,000 per Delegate).

## 7. SENIORITY/JOB PROTECTION

### A.

Employees employed by an Employer prior to January 1, 2000 shall be protected against layoff. In the event an Employer raises a substantial issue over the number of its protected bargaining unit Employees (e.g., more than seventy-five percent (75%) of the Employees in a department or area are protected) the issue may be referred to a Committee made up of Dennis Rivera, the President of the Union, and John Chobor, the Executive Director of the Association, or their designees, but shall not be subject to the arbitration process.

Unprotected Employees who are laid off are eligible for benefits from the Job Security Fund.

### B.

In the event the Employer transfers an Employee covered by the employment guaranty to a lower rated position or reduces his/her hours, the Employee's base weekly salary will not be reduced during the term of this Agreement. As applied to part-time Employees, this salary guarantee means that the Employee's annual actual hours, excluding overtime, shall not be reduced below such hours for the twelve (12) month period ending June 3, 2004 nor shall the Employee's current hourly rate, as modified by Article 12 Sections A through D be reduced.

### C.

The Employer shall continue to have the right to train or retrain its Employees, including those covered by paragraph A above.

### D.

No Employees in the bargaining unit shall be laid off during the term of this Agreement without prior consultation with and approval of the Union. Notice of the Employer's intention to layoff

and return to work at once.

The Employer agrees that it will not lock out covered Employees during the term of this Agreement.

## 9. GRIEVANCE PROCEDURE

A. All complaints, disputes, controversies or grievances arising between the parties hereto involving questions of interpretation or application of any clause of this Agreement, or any acts, conduct or relations between any of the parties hereto and/or between the Union and any Employer, directly or indirectly, which shall not have been adjusted by and between those involved shall be submitted to the Impartial Chairman or Impartial Chairwoman hereinafter mentioned for arbitration and his or her decision shall be final and binding upon the parties hereto. In the event of a willful default by any party in appearing before the Impartial Chairman or Impartial Chairwoman after due written notice shall have been given to the said party, the Impartial Chairman or Impartial Chairwoman is hereby authorized to render a decision upon the testimony of the party appearing.

B. The parties reappoint Martin F. Scheinman for a new five (5) year term as Impartial Chairman. The Impartial Chairman may be removed during the term of this Agreement by agreement of the parties and a substitute arbitrator may be added by mutual agreement. Should the Impartial Chairman resign, refuse to act or be incapable of acting, or should the office become vacant for any reason whatsoever, the Association and the Union shall immediately and within five (5) days after the occurrence of such vacancy, designate another person to act as such Impartial Chairman or Impartial Chairwoman. If they fail to agree upon the designation, it shall be submitted to the New York State Employment Relations Board for its selection of a person to serve as Impartial Chairman or Impartial Chairwoman, and the parties hereto agree to accept its designation.

C. In the event of any complaint, dispute, controversy or grievance arising out of this Agreement, and the Impartial Chairman is unable or refuses to act, then such complaint, dispute, controversy or grievance shall be referred to an arbitrator to be selected by the New York State Employment Relations Board, whose decision in the matter in dispute shall be final and binding upon the parties.

D. The decision of the Impartial Chairman or other arbitrator must be rendered within thirty (30) days after the complete submission of the controversy or dispute to him or her and shall have the effect of a judgment entered upon an award made, as provided by the arbitration provisions of the Civil Practice Law and Rules of the State of New York, entitling the entry of judgment in a court of competent jurisdiction against the defaulting party who fails to carry out or abide by the Decision.

The parties agree to use their best efforts to arbitrate as many grievances as feasible involving the same Employer on any scheduled arbitration date.

E. Fees paid to the Impartial Chairman or other arbitrator appointed hereunder shall be shared as follows: one-half (1/2) by the Association and one-half (1/2) by the Union.

The Impartial Chairman shall be authorized to appoint additional arbitrators. If the parties jointly submit to him a panel of arbitrators, he shall appoint such additional arbitrators from among the arbitrators on such panel.

F. An Employer shall have the right, without first discharging an Employee, to a declaratory opinion of the Impartial Chairman as to whether the Employer is justified in discharging the Employee.

G. Should any complaint, dispute controversy or grievance (hereinafter collectively referred to as "grievance") arise between the parties hereto, involving questions of inter-pretation or application of any clause of this Agreement, or any act, conduct or relation between either of the parties hereto and/or between the Union and any Employer, directly or in-directly, there shall not be any suspension of work on account of such differences, but the grievances shall first be discussed with the Employer or its designee and an earnest effort shall be made to settle them promptly and in accordance with the provisions of this Agreement and failing of settlement, shall be resolved in the manner hereinafter set forth. Each Employer shall designate one person with authority to settle such grievances.

H. Each grievance, in any event, shall be presented to the other party hereto in writing, on forms adopted by the Union and the Association. Grievances arising from discharges, other disciplinary action or layoffs shall be presented within thirty (30) work days from the time of the occurrence, or from the time such occurrence should reasonably have become known, whichever is later. Grievances arising from overtime claims, Employee classification claims and/or matters relating to the Employee's classification, shall be presented within fifteen (15) months after the claim arose or after such claim should reasonably have become known, whichever is later. No other time limitations except those imposed by law are intended, except that grievances shall be submitted within a reasonable time after the claim arises. In the event that a grievance relating to discharge, other discipline or layoff is not presented within the time limitation set forth above, such grievance shall be deemed to have been waived by the aggrieved party and, for all purposes, barred; provided, however, if the grievance occurs when

the Employee aggrieved is absent from the facility due to vacation, sickness, or leave of absence, such workday periods shall not commence until the Employee returns to work or reasonably should have returned to work.

I.    The Impartial Chairman shall endeavor to hear suspension cases submitted to him within (6) weeks from the date of submission.

J.    All discharge and indefinite suspension grievances must be heard within thirty (30) days of submission to the Impartial Chairman. If he does not schedule a hearing to be held within thirty (30) days the grievance shall be referred by the Impartial Chairman to an alternate arbitrator from a panel to be named by the parties.

K.    No adjournment of discharge and indefinite suspension grievances shall be granted for a period of more than two (2) weeks; no second adjournment shall be granted, except in extraordinary circumstances.

L..    Notwithstanding anything herein to the contrary set forth, no grievance, other than those arising from discharge, other discipline, layoff, alleged violation of check-off of Union security provisions, or contributions to the Benefit or Pension Funds, shall be submitted to the Impartial Chairman, in the absence of the mutual consent of the parties, without having first been submitted to a joint committee of Union and Association representatives (hereinafter referred to as the "Labor-Management Committee") for determination as hereinafter set forth.

M.    Grievances may arise of a nature so general as directly to affect a large number of the Employees employed by members of the Association. Issues of this nature need not be subjected to the entire grievance procedure, but may be initiated by either party by submission directly to the Labor-Management Committee. Any grievance may be submitted to the Labor-Management Committee, or to the Impartial Chairman, at any time by mutual agreement of the parties as to the terms and conditions of such submission. To avoid the filing of multiple grievances by persons with identical claims the Employer and/or the Association may agree in writing that the settlement of a single grievance shall be deemed equally applicable to all Employees with identical claims. In the absence of such agreement, grievance settlements shall not have general application.

N.    The Labor-Management Committee shall:

   1.    Consist of three (3) representatives of the Union and three (3) representatives of the Association. Each party shall also designate three (3) alternates.

   2.    Meet every second Tuesday (except during the months of June, July and August, when it shall meet every third Tuesday), or such other day as the parties may mutually agree upon, pro-

vided, however, that the Union provides the Association with a written agenda at least three (3) work days in advance of a scheduled meeting. If a scheduled meeting falls upon a holiday, it shall be rescheduled for the next work day. If either party fails to attend a scheduled meeting, the non-defaulting party may submit any pending grievance on the agenda of such meeting directly to arbitration. In the event either party hereto fails, refuses or omits to attend two (2) consecutive scheduled meetings (for which a written agenda has been provided), then the Labor-Management Committee shall be disbanded and any and all grievances shall be submitted directly to the Impartial Chairman. A party shall be deemed to have attended a meeting if any two (2) of its representatives, or their alternates, are in attendance.

   3.    Endeavor to amicably adjust and dispose of all grievances submitted to it. Any settlement arrived at by the Labor-Management Committee shall be final and binding upon the parties to such grievance.

   4.    Shall make rules and regulations not inconsistent with this Agreement, to govern its conduct and procedures.

O.    A warning notice shall not be issued without the prior knowledge of the Union Delegate and the reason therefore, and a copy of all warning notices issued shall be sent to the Union office by regular mail.

P.    The Union shall have access to documents in personnel files which are reasonably related to the investigation of pending grievances and for use in arbitration.

Q.    The parties shall establish a special labor-management relations committee. The Committee shall develop policies and procedures regarding the conduct of labor relations between management and union representatives in a residential health care facility. If the Committee is unable to agree upon such policies and procedures, the Impartial Chairman shall issue rules that shall be binding on the parties.

R.    The parties acknowledge their mutual interest in reducing the number of grievances pending before the date of this Agreement so as to timely implement the grievance and arbitration provisions of this Agreement. If the parties mutually consent, they will hold special labor-management meetings in order to endeavor to reach settlements, where possible, of said pending grievances.

Said special labor-management meetings shall be held solely for the negotiation of said grievances and shall be held within six (6) months of the execution of this Agreement, unless both sides agree to un adjournment. The grieving party shall present a full agenda of all grievances thirty (30) days prior to the date of a scheduled labor-management meeting. Such meetings will be

Case 1:07-cv-08652-PAC   Document 1-2   Filed 10/05/2007   Page 9 of 49

held separately for each facility, at times and places to be determined by both parties. Such meetings shall be scheduled during working hours and/or during evenings and weekends. The parties and their representatives shall be present at the special labor-management meetings. No witnesses shall be heard at said meetings, unless by mutual consent of the parties, but documentary evidence may be presented and discussed. No statements made in such meetings shall be admissible in any subsequent arbitration, or other proceeding, by either party.

The parties hereby designate Martin F. Scheinman as the mediator who shall conduct said special labor-management meetings. The parties shall agree upon fees with the mediator, and such fees shall be shared equally by the parties.

Any matters not settled or withdrawn as a result of said special labor-management meetings shall be scheduled for arbitration pursuant to the relevant provisions of this Agreement. It is understood that the person who mediates the aforesaid disputes shall also be the arbitrator of such grievances in the event that a settlement is not reached and the matter proceeds to arbitration.

The mediator may be removed by agreement of the parties and a substitute mediator may be added by mutual agreement. An additional mediator may hereafter be named by mutual consent of the parties.

Nothing in this provision shall preclude discussion and/or negotiation of any grievance in any other forum, including labor-management meetings.

## 10. WORK WEEK

A. The regular work week shall be thirty-five (35) hours consisting of five (5) consecutive work days in any week, except where necessary to provide for rotating weekends off; the work day shall consist of seven (7) consecutive hours each day, excluding forty-five (45) minutes for meals. In addition, the Employer guarantees, and the Employees shall work, fifteen (15) additional minutes each day of overtime work at straight time pay. All hours worked in excess of seven and one-quarter (7-1/4) hours in any one (1) day or thirty-six and one-quarter (36-1/4) hours in any week shall be paid for at the rate of time and one-half (1-1/2) the regular hourly rate of pay.

B. All time worked on either or both the sixth (6th) and seventh (7th) consecutive days shall be paid for at a rate of time and one-half (1-1/2) the regular hourly rate of pay, except where necessary to provide for rotating weekends off.

C. The parties recognize that special circumstances might require a change in the work week of the cook in a nursing home and due consideration will be given to the problem. In the event

the parties are unable to agree upon the days to be worked by the cook, it shall be submitted for the determination in the manner provided for the settlement of grievances.

D. No overtime shall be payable except for services specifically authorized by the Employer.

E. Each Employee shall receive two (2) fifteen (15) minute breaks per shift.

F. There shall be a ten (10) minute grace period before an Employee is docked for lateness, provided such privilege is not abused. It shall be considered an abuse of the privilege if an Employee is late twice by five (5) minutes or once (1) by ten (10) minutes in any thirty (30) day period. This privilege is not intended to condone frequent lateness of lesser amounts. Where an Employer, however, has a less stringent practice with regard to lateness, such practice shall continue. In no event shall any Employee be docked for more than his or her actual lateness.

## 11. AGENCY EMPLOYEES, TEMPORARY EMPLOYEES, STAFFING SCHEDULES, SLOTTED AND NON-SLOTTED EMPLOYEES (PERMANENT AND REPLACEMENT EMPLOYEES)

### A. Limiting Agency Workers

Effective January 1, 2003, each Employer is limited to the use of one (1) agency worker per vacant position, for a maximum of sixty (60) days, while the Employer seeks to recruit a regular worker for the position.

### B. Staffing Schedules

1. Each Employer shall post in the facility a staffing schedule for all bargaining unit Employees with full and part-time slots. Such schedule shall cover the facility's complete staffing requirements (excluding supervisory and management personnel). Each employment slot shall be based upon a full year schedule. All bargaining unit work shall be performed only by slotted/permanent Employees except as provided below.[1]

2. Each Employer shall be required to schedule Employees on a twenty-eight (28) day schedule in the form attached hereto as Schedule "C" and shall provide the Union and the various Greater New York Funds on a monthly basis with a complete and legible copy of each such twenty-eight (28) day schedule within ten (10) business days after the period covered by the schedule. Such submission shall be made without the necessity of a prior request by the Union.

---

[1] The parties agree that all scheduling shall be in strict conformity with the practices and definitions set forth in this subparagraph notwithstanding any prior conflicting interpretation contained in any arbitration awards or other determinations by prior arbitrators of any of the terms or definitions used herein.

3. In addition to the schedules described in paragraph 2, the Employers shall submit to the Union, on a monthly basis, copies of Fund remittance reports, with additional information provided in a format agreed to by the parties, showing the hours worked by each Employee, the total number of non-working benefit hours, the total number of replacement personnel hours, and the total hours worked by agency employees. In the event the parties are unable to agree on the format for such report within thirty (30) days following ratification of this Agreement, the matter shall be submitted to the Impartial Chairman for a final and binding determination.

### C.  Slotted Employees (Permanent Employees)

1. Any Employer which fails to fulfill the scheduling requirements, as described in subparagraph 11(B) above, including providing all requested schedules to the Union and the various 1199/SEIU Greater New York Funds, shall be deemed not to have implemented Article 11 of this Collective Bargaining Agreement and such provisions of Article 11 which are of benefit to the Employer shall not be applicable to such Employer.

2. No Employee's current schedule shall be reduced by the allocation of slots undertaken to implement this provision.

3. Slotted/permanent Employees are those who fill the employment slots.

4. Full-time slots for slotted/permanent Employees shall be those that consist of five (5) days per week on the slotting schedule.

5. Part-time slots for slotted/permanent Employees shall be those that consist of fewer than five (5) days on the slotting schedule.

6. Slotted/permanent part-time Employees shall receive the following benefits:

> Employers shall make Funds contributions on behalf of slotted part-time Employees who work one (1) day or more per week. The Employers shall provide pro-rata benefits.

> Contributions to the Funds shall be waived for part-time Employees working less than one (1) day per week who receive the ten percent (10%) premium above the regular hourly rate of pay for full-time Employees in their classification.

7. Each Employer covered by this Agreement shall be required to employ one (1) slotted/permanent replacement Employee for each one hundred (100) beds in its facility, up to a maximum of two (2) such Employees. Facilities with less than sixty (60) beds shall comply with this provision on a pro-rata basis.

These permanent replacement Employees shall be employed on a regular basis substituting for slotted/permanent Employees during their absence on non-working benefit days (leave, holidays, personal days or vacation) and shall be covered by all of the terms and conditions of this Agreement.

### D.  Non-Slotted Employees (Replacement Employees)

1. Non-slotted/replacement Employees are those persons who only substitute for slotted/permanent Employees during their absence on non-working benefit days (leave, holidays, personal days or vacation).

2. Non-slotted/replacement Employees shall not be subject to the terms and benefits of this Agreement except as follows and as otherwise provided for in this Agreement:

> The non-slotted/replacement Employees shall be subject to the union security provisions of this contract.

> The Employer will not be required to make contributions to the Funds on behalf of non-slotted/replacement Employees who work less than eight hundred and fifty (850) hours as specified pursuant to the Trust Indenture of 1199SEIU Greater New York Pension Fund in a calendar year. In the event that the total gross payroll for non-slotted/replacement Employees exceeds twenty percent (20%) of the total gross annual payroll of the facility, the Employer shall be required to make contributions on that amount exceeding twenty percent (20%) of the gross bargaining unit payroll.

> Upon the completion of thirty (30) working days of employment with an Employer, a nonslotted/replacement Employee shall be eligible for health coverage, and, anything above to the contrary notwithstanding, the Employer shall remit contributions to the Benefit Fund as follows:

> Commencing the month after the completion of thirty (30) working days, contributions shall be remitted on behalf of all non-slotted/replacement Employees who work eleven (11) or more days per month and for each month thereafter in which they perform said services as aforesaid.

3. In addition to such other benefits provided herein and under the Collective Bargaining Agreement which are applicable to non-slotted/replacement Employees, after thirty (30) days of employment, each non-slotted/replacement Employee shall receive an increase in his or her hourly wage equal to ten dollars ($10.00) per

week. In addition, the check-off authorization and uniform allowance provisions of the Collective Bargaining Agreement shall apply to non-slotted/replacement Employees. The uniform allowance shall be paid to non-slotted/replacement Employees on the basis of time worked.

**E. Expedited Arbitration Procedures for Systemic Slotting Grievances**

Any claimed systemic slotting violation arising under the Slotting provisions of this Agreement ("slotting grievance") may be brought by any of the parties hereto to expedited arbitration. Expedited arbitration of such disputes shall be conducted as set forth herein when the written demand for arbitration designates it as a systemic slotting grievance. If the demand for arbitration does not include that designation, the matter shall be heard by the parties' Impartial Chairperson, pursuant to the grievance arbitration procedures set forth in the Agreement as herein modified. The grieving party shall provide the other party with copies of all documentation upon which it intends to rely in support of its claim at the expedited arbitration at the time it files its demand for expedited arbitration pursuant to the rights contained in this Article.

The expedited arbitrations relating to systemic slotting grievances shall be submitted to the Impartial Chairman. The parties shall agree upon fees with the Impartial Chairman, and such fees shall be shared equally by the parties.

The Impartial Chairman shall conduct a hearing on a systemic slotting grievance within twenty (20) working days of receipt of the grieving party's demand for arbitration in said matter, unless both parties agree to an adjournment of the hearing or the arbitrator finds good cause for granting an adjournment requested by either party. In the event the arbitrator grants an adjournment requested by either party, said adjournment shall, to the extent possible, be for no more than ten (10) working days. At the conclusion of the hearing, the arbitrator shall issue a written decision within ten (10) working days.

**F. Industry Committee** The parties shall establish an Industry Committee to address systemic abuses regarding the use of non-slotted Employees.

## 12. WAGE INCREASES

A. Effective June 1, 2004, Employees in covered classifications shall receive a three percent (3%) increase in wages or be paid the minimum rate for their classification as set forth in Schedule B, whichever is greater.

For non-parity facilities, the wage increases referred to herein and in (B) through (D) below shall be calculated on the Master Facility wage base.

B. Effective December 1, 2005, Employees in covered classifications shall receive a three percent (3%) increase in wages or be paid the minimum rate for their classification as set forth in Schedule B, whichever is greater.

C. Effective December 1, 2006, Employees in covered classifications shall receive a three percent (3%) increase in wages or be paid the minimum rate for their classification as set forth in Schedule B, whichever is greater.

D. Effective July 1, 2007, Employees in covered classifications shall receive a three percent (3%) increase in wages or be paid the minimum rate for their classification as set forth in Schedule B, whichever is greater.

E. The wage increases referred to in (A), (B), (C) and (D) above shall be compounded and added to the minimums. (See Schedule B).

F. The parties have agreed to the minimums set forth in Schedule B. No Employee shall receive less than the minimum for his or her job classification.

G. Nothing herein contained shall prevent an Employer from giving additional merit increases, bonuses or other similar payments as it shall desire.

## 13. MINIMUM RATES OF PAY

A. The parties have heretofore established job classifications and minimum rates of pay for each such classification. A list of the said classifications, as amended, and their minimums are attached to this Agreement as Schedule "B" and made part of this Agreement as if they were fully and at length set forth herein. The parties shall form a committee to eliminate from this list, where appropriate, those job classifications in which there are currently no Employees and for which no Employees are contemplated. Additional classifications are attached to this Agreement at the end of Schedule "B" and where applicable, are made part of this Agreement as if they were fully and at length set forth herein.

B. Employees performing work of a higher classification should receive the rate of that classification. Where an opportunity exists for an Employee to move into a higher paying classification, the Employer and the Union may establish an interim rate for a stipulated period of time, not exceeding thirty (30) days, while the Employee trains and tries out for such higher classification. Such interim rate shall be in excess of the Employee's existing rate but less than the prevailing rate for such higher classification.

C. All Employees who have completed four (4) years or more but less than eight (8) years of substantially continuous employment shall receive one dollar ($1.00) per week on the effective date

of each annual increase provided herein. All Employees who have completed eight (8) years or more but less than ten (10) years of substantially continuous employment shall receive two dollars ($2.00) per week on the effective date of each annual increase provided herein. All Employees who have completed ten (10) years or more of substantially continuous employment shall receive three dollars ($3.00) per week on the effective date of each annual increase provided herein. "Annual" for the purposes of this paragraph shall be defined to mean January 1st in each contract year. The longevity pay provided herein shall be noncumulative.

D.  Wages are to be paid to the Employees in cash each and every week. However, where mutually agreed upon between the Union and the Employer, payments may be made by check. Accompanying all pay shall be an itemized list of deductions.

## 14. SHIFT DIFFERENTIAL

All Employees regularly assigned to a shift commencing before 6:00 a.m. or ending after 7:00 p.m. shall receive a shift differential of ten percent (10%) additional to their regular rate of pay, except that anyone commencing before 6:00 a.m. but not earlier than 5:00 a.m. shall receive a shift differential of two (2) hours and anyone whose shift terminates after 7:00 p.m. shall be entitled to a shift differential for all hours after 3:00 p.m.

## 15. MEALS

The Employers shall continue to furnish a hot meal to each Employee each day consisting of beverage, soup or salad, meat, poultry or fish, two (2) vegetables, a dessert or fruit. Meals shall be served under healthful and hygienic conditions. The failure, refusal or omission of an Employer to provide the required meal, shall constitute sufficient grounds to support the claim of affected Employees for payment in lieu thereof at the rate of two dollars ($2.00) per meal.

## 16. HOLIDAYS

A.  All Employees covered by this Agreement shall receive the following holidays with pay:

| | |
|---|---|
| New Year's Day | Thanksgiving Day |
| Decoration Day | Two (2) Personal Days |
| Labor Day | Employee's Birthday |
| Christmas Day | Martin Luther King's Birthday |
| Lincoln's Birthday | Washington's Birthday |
| Independence Day | |

All leap-year birthday Employees shall have an equivalent day

off each year. The date of an Employee's birthday as set forth on his or her application for employment shall be conclusive upon the Employer. If a holiday or the Employee's birthday falls on one of his or her regular days off, he or she shall be entitled to the holiday or birthday pay. Employees must work three (3) months in each calendar year before becoming eligible for personal days.

B.  An Employee required to work on any of the following "legal" holidays shall be paid at the rate of time and one-half (1-1/2) his or her regular hourly rate for all hours worked on these holidays and shall, in addition, be paid a day's pay at his or her regular straight time rate as holiday pay:

New Year's Day
Martin Luther King's Birthday
Lincoln's Birthday
Washington's Birthday
Decoration Day
Independence Day
Labor Day
Thanksgiving Day
Christmas Day

An Employee required to work on any holiday other than those specified as "legal" holidays shall receive his or her regular straight time pay in addition to the holiday pay.

However, an Employee who substitutes for another Employee on a holiday shall receive holiday pay if he or she has worked the major part of the week in which the holiday falls. Further, a replacement who has not worked regularly during that week shall receive only the regular day's pay for working on such holiday.

C.  Employees shall be notified by their respective Employers five (5) days in advance in the event the said Employer requires such Employee or Employees to work on the holiday.

D.  If any one of the holidays or the Employee's birthday occurs during his or her vacation period, such Employee shall be entitled to receive an additional day's pay in lieu thereof.

E.  In order to qualify for holiday pay, an Employee must work the scheduled work day before and the scheduled work day after the holiday, or have a reasonable excuse for absence on the day before or after the holiday.

F.  Where a holiday falls on Sunday, it shall be observed the following Monday. Where the State and Federal Governments have established different days for the celebration of the same holiday, and where one of those days results in the holiday being celebrated on Monday and the other does not, the one which results in a Monday celebration shall be the one which is applicable hereunder.

### 17. VACATIONS

A. All Employees who complete six (6) months of substantially continuous employment shall, upon the completion of such six (6) months, receive one (1) week vacation with pay.

B. All Employees who have completed the second six (6) months of substantially continuous employment shall receive an additional one (1) week of vacation with pay.

C. All Employees who have completed one (1) year but less than four (4) years of substantially continuous employment shall receive two (2) weeks of vacation with pay.

D. All Employees who have completed four (4) years but less than five (5) years of substantially continuous employment shall receive three (3) weeks of vacation with pay.

E. Employees who have completed five (5) years but less than fifteen (15) years of substantially continuous employment shall become entitled to four (4) weeks of vacation with pay.

F. Employees who have completed fifteen (15) years or more of substantially continuous employment shall become entitled to five (5) weeks of vacation with pay for each year thereafter.

G. Any Employer and Employee may agree on a definite period for that Employee's vacation.

H. If any Employee's employment terminates for any reason whatsoever after he or she has been substantially continuously employed six (6) months or more, he or she shall receive pro-rata vacation pay.

I. Vacation pay shall be paid in cash immediately preceding the vacation at the rate prevailing at the time the vacation is taken.

### 18. LEAVES

A. Sick Leave

A doctor's note will not be required for absences of less than three (3) days, unless a pattern of abuse of the sick leave provisions of this Agreement can be shown. Paid sick leave may be utilized for the care of children or other immediate family members of covered Employees.

Each Employee shall be entitled to receive paid sick leave as follows:

1. During the first year of employment an Employee shall receive ten (10) days paid sick leave accruing at the rate of ten-twelfths (10/12ths) of a day per month; during the second year of employment an Employee shall receive twelve (12) days paid sick leave per year accruing at the rate of one (1) day per month; the third year of employment an Employee shall receive thirteen (13) days paid sick leave per year accruing at the rate of one and one-twelfth (1-1/12th) days per month; beginning with the fourth year of employment an Employee shall receive fifteen (15) days paid sick leave per year accruing at the rate of one and one-fourth (1-1/4th) days per month.

2. Unused sick leaves shall be paid to Employees at least one (1) week prior to Christmas time in each year except that in the year this Agreement terminates or upon termination of employment for any reason whatsoever, it shall be paid on such termination date. Sick leave shall be paid for at the rate prevailing at the time of accrual.

3. In the event that an Employer fails to pay sick leave pay when due, the Union may take such matter to arbitration and the Impartial Chairman in addition to granting such other relief as he may deem appropriate in the premises, shall be empowered to direct such Employer thereafter to set aside unused sick leave pay, on a monthly basis, in a separate account, established for that purpose by the Employer.

B. Leave of Absence

Any Employee becoming ill shall be entitled to a leave of absence for any illness lasting up to one (1) year, with the Employer entitled to notification and verification if requested and said Employee shall be entitled to reinstatement without loss of seniority. Any Employee injured upon the job shall be reinstated upon recovery without loss of seniority or other benefits provided herein.

C. Maternity Leave

Leaves of absence shall be granted for pregnancy for a period of up to ten (10) months commencing as of the time the pregnant Employee leaves her employment and the said Employee shall be entitled to reinstatement at the conclusion of such leave without loss of seniority. An Employee must inform the Employer as soon as she learns of her pregnancy.

D. Bereavement Leave

In the event of death of an Employee's parent, brother, sister, mother-in-law or father-in-law, grandparents, legal guardians if reared by such, or grandchild, said Employee shall be entitled to three (3) days of paid leave; in the event of the death of the Employee's spouse or child, said Employee shall be entitled to five (5) days of paid leave. Such leave shall be effective only after said Employee has completed his or her thirty (30) day probationary period.

E. Paternity Leave

In the event an Employee's spouse gives birth to a child, then the Employee shall be entitled to three (3) days of paid leave. Such leave shall be effective only after said Employee has completed his thirty (30) day probationary period.

F. Leave for Marriage

In the event an Employee marries, the Employee shall be

Case 1:07-cv-08652-PAC   Document 1-2   Filed 10/05/2007   Page 14 of 49

entitled to three (3) days of paid leave. Such leave shall be effective only after said Employee has completed his or her thirty (30) day probationary period.

### G. Leave for Jury Duty

Employees called for jury duty shall be paid the difference between their regular pay and the amount they receive as jury pay. Employees regularly employed on the morning shift shall also receive their regular rate of pay for actual time lost in qualifying for jury duty; Employees regularly employed on the afternoon shift shall receive up to two (2) hours pay for time lost from work while qualifying for jury duty computed from the time they are excused from court. Such benefit shall be effective only after said Employee has completed his or her thirty (30) day probationary period.

### H. Educational Leave

Employees covered by the Collective Bargaining Agreement who wish to undertake the schooling required to qualify for a higher paying position, such as, but not limited to Registered Nurses, Licensed Practical Nurses, Licensed Engineers and Dietitians, shall be granted a leave of absence for not more than eighteen (18) months to complete such schooling and, upon proof of satisfactory completion thereof, shall be granted preferential hiring rights in the classification in which such Employee is then qualified.

## 19. UNIFORMS

The Employer shall furnish and maintain all uniforms of Employees, except that where an Employee furnishes and maintains his or her own uniform such Employee shall receive an allowance of two dollars ($2.00) per week. Maintenance workers, porters, and persons employed in the kitchen, shall be furnished with uniforms by the Employer, which the Employer shall maintain, or receive an allowance of three dollars ($3.00) per week to provide and maintain their uniforms, at the discretion of the Employer. Where an Employer has been furnishing and maintaining uniforms, it shall continue to do so unless the practice is changed by mutual consent. No deduction shall be made from the uniform allowance on account of illness, unless the Employee is absent for an entire week.

## 20. MAINTENANCE OF STANDARDS

A. No Employer shall lower any standards of wages, hours or working conditions prevailing in its establishment as a result of this Agreement.

B. No Employee will be transferred to a shift other than that for which said Employee was hired, except by mutual consent. There shall be no change in schedules except upon five (5) days' notice to the Union or by mutual consent.

## 21. DISABILITY BENEFITS

The Employers shall provide statutory disability coverage and shall pay the Employee contribution to state-mandated disability coverage, which is currently sixty cents ($.60) per week.

## 22. MISCELLANEOUS EMPLOYEE BENEFITS

1. The Employer will provide a locker with a key to each Employee. Separate, clean dressing rooms for men and women Employees will be maintained by the Employer. The Union and the Employer will discuss the same whenever an Employer makes a claim of hardship in complying herewith.

2. The parties agree to the principle that efforts shall be made to provide Employees with rotating weekends off if they request the same, it being the intention to achieve alternate weekend duty while maintaining the privilege of seniority with respect to choice of working days. To facilitate the desired scheduling, the word "weekend" for these purposes shall be defined as "Saturday and Sunday" or "Sunday and Monday."

3. Each Employee in the bargaining unit shall receive two dollars and fifty cents ($2.50) per week toward his or her cost of transportation, prorated, however, in accordance with actual days worked.

4. There shall be a special file cabinet on each floor for the use of the ward clerks.

5. There shall be a lifter on each shift. In the absence of a lifter, a mechanical lifting machine shall be provided.

## 23. BENEFIT FUND

A. The Association and the Union shall continue to maintain a Benefit Fund, known as the 1199SEIU Greater New York Benefit Fund for their Employees and each Employer shall make contributions thereto for each Employee covered by this Agreement in the percentages set forth below in Article 29 of the gross payroll of all bargaining unit Employees, for whom contributions are required. "Gross payroll" for the purpose of this provision shall be defined to exclude payment for unused sick days, uniforms, transportation allowance and meals.

B. Such contribution shall be paid by each Employer on or before the tenth day of each month and shall cover the previous month's Employees covered by this Agreement. In the event the Employer, without justification, fails to promptly remit such monies, the Impartial Chairman may, upon application, assess interest at the legal rate against the Employer.

C. The payments so made by the Employer shall be used by the 1199SEIU Greater New York Benefit Fund solely for those fringe

benefits set forth in the Trust Agreement heretofore executed and thereafter amended establishing such 1199SEIU Greater New York Benefit Fund.

D. The Employer shall furnish to the Union monthly a statement indicating the names of the Employees covered by this Agreement, their social security numbers and the amount of wages paid, or such other report, record or statement as shall supply such information, and agree to make available for inspection to the Trustees of the Fund all payroll records that may be required for the sound and efficient operation of the Fund, or which may be required by the insurance companies, if any, insuring the Employees.

E. The parties understand that the 1199SEIU Greater New York Benefit Fund will be held and managed under the terms and provisions of an Agreement and Declaration of Trust executed in connection with the said Fund, copies of which are on file with the Association and the Union, and the Employers, although they may have the right to do so, shall be under no obligation to see to the application of monies paid to the Fund. The Fund shall submit annually to the Association and to the Union a report respecting the application of the monies received by it and the benefits paid.

## 24. PENSION FUND

A. The Association and the Union shall continue to maintain a Pension Fund, known as the 1199SEIU Greater New York Pension Fund, for their Employees and each Employer shall make contributions thereto for each of his Employees covered by this Agreement in the percentages set forth below in Article 29 of the gross payroll of bargaining unit Employees for whom contributions are required. "Gross payroll" for the purpose of this provision shall be defined to exclude payment for unused sick days, uniforms, transportation allowance and meals.

B. Such contributions shall be paid by each Employer on or before the tenth day of each month and shall cover the previous month's Employees covered by this Agreement. In the event the Employer, without justification fails to promptly remit such monies, the Impartial Chairman can, upon application, assess interest at the legal rate against the Employer.

C. The payments so made by the Employers shall be used by the 1199SEIU Greater New York Pension Fund solely for those benefits set forth in the Trust Agreement executed hereunder and thereafter amended establishing such 1199SEIU Greater New York Pension Fund.

D. The Employer shall furnish to the Union monthly a statement indicating the names of the Employees covered by this

Agreement, their social security numbers and the amount of wages paid, or such other report, record or statement as shall supply such information, and agree to make available for inspection to the Trustees of the Fund all payroll records of bargaining unit Employees that may be required for the sound and efficient operation of the Fund, or which may be required by the insurance companies, if any, insuring the Employees.

E. The parties understand that the 1199SEIU Greater New York Pension Fund will be held and managed under the terms and provisions of an Agreement and Declaration of Trust executed in connection with the said Fund, as the same from time to time might be amended, copies of which are on file with the Association and the Union, and the Employers, although they may have the right to do so, shall be under no obligation to see to the application of monies paid to the Fund. The Fund shall submit annually to the Association and to the Union a report respecting the application of the monies received by it and the benefits paid.

## 25. EDUCATION FUND

A. The Association and the Union shall continue to maintain an Education Fund, known as the 1199SEIU/Greater New York Education Fund, for their Employees and each Employer shall make contributions thereto for each of his Employees covered by this Agreement in the percentages set forth below in Article 29 of the gross payroll of bargaining unit Employees for whom contributions are required. "Gross payroll" for the purpose of this provision shall be defined to exclude payment for unused sick days, uniforms, transportation allowance and meals.

B. Such contributions shall be paid by each Employer on or before the tenth day of each month and shall cover the previous month's Employees covered by this Agreement. In the event the Employer, without justification fails to promptly remit such monies, the Impartial Chairman can, upon application, assess interest at the legal rate against the Employer.

C. The payments so made by the Employers shall be used by the 1199SEIU/Greater New York Education Fund solely for those benefits set forth in the Trust Agreement executed hereunder and thereafter amended establishing such 1199SEIU/Greater New York Education Fund.

D. The Employer shall furnish to the Union monthly a statement indicating the names of the Employees covered by this Agreement, their social security numbers and the amount of wages paid, or such other report, record or statement as shall supply such information, and agree to make available for inspection to the Trustees of the Fund all payroll records of bargaining unit Employ-

the Union a report respecting the application of the monies received by it and the benefits paid.

## 28. CHILD CARE FUND

A. The Association and the Union shall establish and maintain a Child Care Fund, known as the 1199SEIU Greater New York Child Care Fund, for their Employees and each Employer shall make contributions thereto for each Employee covered by this Agreement in the percentages set forth below in Article 29 of the gross payroll of all bargaining unit Employees, for whom contributions are required. "Gross payroll" for the purpose of this provision shall be defined to exclude payment for unused sick days, uniforms, transportation allowance and meals.

B. Such contribution shall be paid by each Employer on or before the tenth day of each month and shall cover the previous month's Employees covered by this Agreement. In the event the Employer, without justification, fails to promptly remit such monies, the Impartial Chairman may, upon application, assess interest at the legal rate against the Employer.

C. The payments so made by the Employer shall be used by the 1199SEIU Greater New York Child Care Fund solely for those fringe benefits set forth in the Trust Agreement heretofore executed and thereafter amended establishing such 1199SEIU Greater New York Child Care Fund.

D. The Employer shall furnish to the Union monthly a statement indicating the names of the Employees covered by this Agreement, their social security numbers and the amount of wages paid, or such other report, record or statement as shall supply such information, and agree to make available for inspection to the Trustees of the Fund all payroll records that may be required for the sound and efficient operation of the Fund, or which may be required by the insurance companies, if any, insuring the Employees.

E. The parties understand that the 1199SEIU Greater New York Child Care Fund will be held and managed under the terms and provisions of an Agreement and Declaration of Trust executed in connection with the said Fund, copies of which are on file with the Association and the Union, and the Employers, although they may have the right to do so, shall be under no obligation to see to the application of monies paid to the Fund. The Fund shall submit annually to the Association and to the Union a report respecting the application of the monies received by it and the benefits paid.

## 29. FUND CONTRIBUTIONS AND CONTRIBUTION RATES

A. The Employers shall contribute the percentages set forth below of "gross payroll" as that term is defined in the Benefit, Pension, Education, Job Security, Worker Participation and Child Care Fund provisions of this Agreement, for each Employee for whom contributions are required to such Funds.

B. The Employers shall make Funds contributions on behalf of slotted part-time Employees who work one (1) day per week or more, so that such Employees shall be able to receive benefits as developed by the Trustees of the Funds.

C. It is the agreement of the Association, the Union, and the Funds to implement, wherever possible, electronic transmission of Fund contributions and reports and to streamline reporting requirements. The Association, the Union, and the Funds will meet to discuss the most practicable implementation program to achieve this objective.

D. The rate of contribution to the Benefit Fund shall be as follows:

1. The Employers shall continue to contribute to the 1199SEIU Greater New York Benefit Fund at the rate of seventeen and eighty-three one hundredth percent (17.83%) of gross payroll. Thereafter the contribution rate will be adjusted by the Trustees as necessary to maintain the level of benefits currently provided, or as improved by the Trustees during the life of this Agreement, and to provide for a two (2) month reserve.

In the event the Trustees determine, upon advice of the Fund's actuary, that additional contributions are required to maintain the current level of benefits and provide for a two (2) month reserve, the percentage rate of contribution to the Fund shall be increased as the Trustees determine to be necessary. In the event the Trustees cannot agree on any such adjustment, the proper rate of contribution shall be set by the Impartial Chairman.

2. The parties recognize that the Employers in the long term care industry who applied for grants through the Greater New York Consortium shall contribute $15 million dollars to the Benefit Fund from the proceeds received by Employers through the Supplemental Quality Care Grant and related monies in the following manner:

The aforesaid $15 million dollars will be contributed to the Benefit Fund within ten (10) days from the receipt of such amount by the Employers.

Each Employer receiving Supplemental Quality Care Grant and/or related monies shall contribute its proportionate share of the aforesaid $15 million dollars by applying the same percentage as its grant represents to the overall grant dollars received (e.g., if the total amount of grant dollars received by Consortium members is $40 million dollars and the Employer receives $1 million dollars it shall contribute one-fortieth (1/40th) of the $15 million dollars.

E. The rate of contribution to the Pension Fund shall be as follows:

1) The Employers shall contribute to the 1199SEIU Greater New York Pension Fund at the rate of five and eighty-four one hundredth percent (5.84%) of gross payroll. Thereafter, the parties shall adjust the contribution rate based on the advice of the Pension Fund Actuary necessary to fund benefits provided by the plan or as improved hereunder. In the event of any dispute as to the proper contribution rate, the Impartial Chairman shall resolve such dispute.

2) Pension Fund Contributions, Diversions, Suspensions and Additional Contributions:

June 1, 2004 – May 31, 2005:

The Employers shall make three (3) months of contributions to the Pension Fund (March, April and May 2005).

Three (3) months of Pension Fund contributions shall be diverted to the Benefit Fund (September and October 2004 and February 2005).

No contributions shall be required to be made to the Pension Fund for the months of (June, July, August, November and December 2004 and January 2005).

June 1, 2005 – May 31, 2006:

The Employers shall make ten (10) months of contributions to the Pension Fund (August 2005 through May 2006).

Two (2) months of Pension Fund contributions shall be diverted to the Benefit Fund (June and July 2005).

June 1, 2006 – May 31, 2007:

The Employers shall make ten (10) months of contributions to the Pension Fund (August 2006 through May 2007).

Two (2) months of Pension Fund contributions shall be diverted to the Benefit Fund (June and July 2006).

An additional one (1) month of Pension Fund contributions (a thirteenth (13th) month) shall be contributed to the Pension Fund or diverted to the Benefit Fund as determined by the parties according to the economic needs of the Funds (October 2006).

June 1, 2007 – May 31, 2008:

The Employers shall make ten (10) months of contributions to the Pension Fund (August 2007 through May 2008).

Two (2) months of Pension Fund contributions shall be diverted to the Benefit Fund (June and July 2007).

An additional one (1) month of Pension Fund contributions (a thirteenth (13th) month) shall be contributed to the Pension Fund or diverted to the Benefit Fund as determined by the parties according to the economic needs of the Funds (October 2007).

F. The rate of contribution to the Education Fund shall be as follows:

The Employers shall contribute to the 1199SEIU Greater New York Education Fund at the rate of one-half (.5%) percent of gross payroll, as defined in paragraph 25 of this Agreement.

G. The rate of contribution to the Child Care Fund shall be as follows:

The Employers shall contribute to the 1199SEIU Greater New York Child Care Fund at one-half (.5%) percent of gross payroll, as defined in paragraph 28 of this Agreement.

H. The rate of contribution to the Job Security Fund shall be as follows:

Effective June 1, 2005, the Employers shall contribute to the 1199SEIU/Greater New York Job Security Fund at the rate of one-quarter (.25%) percent of gross payroll, as defined in paragraph 26 of this Agreement.

I. The rate of contribution to the Worker Participation Fund shall be as follows:

Effective May 1, 2003, the Employers shall contribute to the 1199SEIU Greater New York Worker Participation Fund Inc. at the rate of one-quarter (.25%) percent of gross payroll, as defined in paragraph 27 of this Agreement.

J. The Employers must commence making contributions to the Funds on behalf of new employees upon the sixtieth (60th) day after the date of hire of such employees. Thereafter, if any Employee, subsequent to the probationary period, works one (1) week in a reporting month, the Employer must make contributions to the Funds on his or her behalf based on his or her entire gross pay for the reporting month.

K. **Exclusions from Bargaining Unit**

For the purposes of defining "gross payroll", the following job classifications shall be excluded:

(a) Administrator and assistant, if any.

(b) Director of Nursing Services.

(c) Consultant Dietitian.

(d) Controller or Headbookkeeper, where there is no Controller; Controller and Headbookkeeper; Headbookkeeper and Assistant Bookkeeper, if any.

(e) One confidential secretary (who spends the greater part of her time working with administration).

(f) Physical and Occupational Therapists.

(g) Executive Housekeeper (performs no floor work).

(h) In-service Training Nurse (performs no floor work).

(i) Consortium Trainees (until they are placed on staff).

(j) Guard.

(k) Social Workers (except as otherwise provided in Schedule "B").

L. In the event a dispute arises in connection with the failure of an Employer to make the required contributions to the various 1199SEIU Greater New York Funds in the full amounts required, and in the event that the Union submits the matter to arbitration and prevails, the Impartial Chairman's decision shall contain a directive requiring the Employer to pay all reasonable audit and accountants' fees, the full amount of the Impartial Chairman's fees, collection expenses including court costs, if any, and interest at the then current legal rate, together with reasonable attorneys' fees for the attorney representing the Union and/or the Funds in connection with the arbitration and/or court proceedings.

Notwithstanding the foregoing, if any Employee is disentitled to any benefits provided by the Funds by reason of an Employer's delinquency in the payment of contributions, such Employer shall be liable to such Employee, in a civil action, for the full amount of the benefits which the Employee lost, together with court costs. Acceptance or collection of delinquent contributions by the Fund shall not absolve the Employer of this liability.

M. In the event that an Employer is two (2) or more months delinquent in making contributions to the various 1199SEIU Greater New York Funds, then the Union may take such matter to arbitration and the Impartial Chairman, in addition to granting such other relief as he may deem appropriate in the premises, shall be empowered to direct such Employer thereafter to enter into an irrevocable "check off" arrangement with the State of New York or such banking institution to enter into such a "check off" arrangement. Such "check off" arrangement must provide for the direct payment to the Funds by the State of New York or such banking institution of contributions due or becoming due from such Employer to the Funds.

The Association shall prepare documents and establish procedures to be followed in connection with the above "check off" provision and Employers shall use such documents and follow such procedures wherever practicable.

Nothing contained in the above "check off" provisions or elsewhere herein shall preclude the Union from taking any other steps which it may deem appropriate in the case of a failure to make Fund contributions as required or make inapplicable any remedy available to the Union, contractually or otherwise.

## 30. PENSION AND HEALTH BENEFITS

A. 1. Persons whose pensions under the Pension Plan were effective on or before December 31, 1991 and who are receiving benefits under the Pension Plan are eligible to receive health insurance coverage under the Benefit Plan and will continue to be eligible to receive such health insurance coverage for the remainder of their lives.

2. Persons whose pension under the Pension Plan is effective between January 1, 1992 and before January 1, 2002 will not be entitled to health insurance coverage at any cost to the Benefit Plan.

3. Persons who retire on or after January 1, 2002 from active covered employment with twenty-five (25) or more years of covered service under a pension fund recognized by the Trustees of the Benefit Fund shall be entitled to receive from the Benefit Fund the following retiree health benefits: (1) a prescription drug benefit up to fifteen hundred dollars ($1,500) per year for retirees at age sixty-two (62) or older which benefits will be coordinated with available government prescription programs; (2) an optical benefit; and (3) coverage of the hospitalization deductible applicable under Medicare. In the event that the parties cannot agree upon the adjustment, if any, in Fund contribution necessary to fund this benefit, the necessary adjustment in the contribution rate shall be set by the Impartial Chairman.

4. Active Employees who retire on or after January 1, 2002 shall receive a pension based on an accrual rate of thirty-five dollars ($35) per month to a maximum pension of eight hundred seventy-five dollars ($875) per month ($35 x 25 years).

5. Active Employees who retire on or after January 1, 2005 shall receive a pension based on an accrual rate of thirty-seven dollars ($37) per month to a maximum pension of nine hundred twenty-five dollars ($925) per month ($37 x 25 years).

B. All Employees regularly scheduled to work full time shall receive full-time health benefits. The Trustees of the 1199SEIU Greater New York Benefit Fund have agreed to act in a manner consistent with this provision.

C. A program of savings initiatives shall be implemented that produces savings of $22 million over the term of this Agreement and achieves a "going out" annual savings rate of at least $4 million by the end of the Agreement. (See Attachment I).

D. A Cost Savings Committee ("Committee") consisting of Dennis Rivera and John Chobor, or their designees, shall be established. The functions of the Committee shall include establishing a base line for measurement, setting benchmarks and milestones, measuring the results of and monitoring the effect of the savings

initiatives referred to in this Agreement. The Committee shall also seek additional ways to improve the cost efficiency of the Benefit Fund.

E.  Effective May 1, 2005, and every twelve (12) months thereafter, a consultant retained by the Committee shall determine if the anticipated savings are being achieved. In the event of a shortfall John Chobor and Dennis Rivera, or their designees, shall decide whether to direct a diversion from the PF to the BF to make up such shortfall.

## 31. CREDIT UNION

Upon written authorization, Employers shall deduct from the wages of covered Employees voluntary contributions to the 1199SEIU Federal Credit Union.

## 32. SEVERANCE

Employees with one or more years of substantially continuous employment who are permanently laid off shall receive severance pay at the rate of one (1) week of pay for each completed year of substantially continuous employment with an Employer up to a maximum of two (2) weeks of pay. For the purpose of this provision, a week's pay shall be defined as the regular weekly pay (exclusive of lump sum payments) of the Employee so affected which was in effect at the time of such permanent layoff.

## 33. CONTRACTING OUT

Any contract or agreement between the Employer and an outside contractor who employs Employees of the Employer in job classifications covered by this Agreement shall comply with all the terms and conditions of this Agreement, including but not limited to the seniority and layoff provisions, and the Employer guarantees the performance thereof by the contractor.

## 34. CHECK-OFF AUTHORIZATION

Upon written authorization, each Employer shall deduct from the first wages paid Employees in each month all dues, assessments and initiation fees which the Union shall notify the Employer to be due to the Union from the Employee. The monies so deducted shall be held by the Employer in trust and they shall remit them to the Union promptly, together with a list of Employees paying said dues, including categories and wages paid. It is the agreement of the Association and the Union, to implement, wherever possible, electronic transmission of dues remittances and to streamline reporting requirements. The Association and the Union, will meet to discuss the most practicable implementation program to

achieve this objective.

In the event the Employer without justification fails to promptly remit such monies, the Impartial Chairman may upon application assess interest at the legal rate against the Employer.

The Union shall have the right to audit payroll records of bargaining unit Employees to insure that Union dues are properly deducted and remitted. The Employer shall be held liable for the failure to make proper deduction of Union dues and initiation fees and to remit same to the Union promptly.

Upon written authorization, the Employer shall deduct from the wages of Employees voluntary contributions to the 1199 Political Action Fund established by the Union for political education purposes.

## 35. SEPARABILITY

In the event that any term, condition or provision of this Agreement in whole or in part is declared by any court of competent jurisdiction or any administrative agency having jurisdiction to be illegal, void and/or invalid, all of the other terms, conditions and provisions of this Agreement shall remain in full force and effect, to the same extent as if that part declared illegal, void and/or invalid had never been incorporated in this Agreement, and in such form the remainder of the Agreement shall continue to be binding upon the parties hereto.

## 36. SUCCESSORS

This Agreement shall be binding upon the parties, their successors or assigns and upon any person, party, partnership or corporation that may take over the ownership, operation and/or management of any nursing home covered by this Agreement.

## 37. INDUSTRY STANDARDS CLAUSE

The parties agree that Employers whose levels of economic remuneration, benefits and conditions are less favorable to the Employees than those contained herein, shall be improved pursuant to schedules agreed to by the parties pertaining to the individual Employer.

Within ten (10) days after ratification of this Agreement, the parties shall meet to determine the wage and other adjustments to be implemented by each non-parity Employer. Within ten (10) days after receipt by each such non-parity Employer of Supplemental Quality Care Grant monies or related monies from the State of New York, the agreed upon wage and other parity adjustments shall be made by each such non-parity Employer. In the event the parties cannot agree within sixty (60) days thereafter as

to the adjustments to be made, the matter shall be submitted to the Impartial Chairman for final adjudication by him, such adjudication to be completed within sixty (60) days. It is understood that all grant monies or related monies received above and beyond the Employers pro-rata share (as described in Article 29 (13) (2)) of the $15,000,000 to be contributed to the Benefit Fund shall be spent on the wage and other parity adjustments.

The foregoing shall satisfy the non-parity Employers' obligations under the provisions of this Article 37 of the CBA during the life of the new agreements.

## 38. REIMBURSEMENT CLAUSE

The parties recognize that the Employers must receive adequate reimbursement from the State of New York to provide for the economic terms and conditions described herein and are dependent upon such reimbursement for the continued implementation of the economic terms of this Agreement.

In the event that any facility does not implement any economic term or condition of this Agreement on the basis of a claim of inadequate reimbursement under this provision of the Agreement, it shall implement such term or condition to the extent it asserts it is able to do so pending a determination by the Impartial Chairman of its claim. In the event that the Impartial Chairman determines that such a claim was not made in good faith and was frivolous, such facility in addition to being required to implement such economic term or condition may be required by the Impartial Chairman to pay for all costs resulting from unnecessary hearings caused by such claim. Such costs shall include all costs and expenses of the Association's attorneys and accountants, the Union's attorneys and accountants and of the Impartial Chairman.

## 39. MOST FAVORED NATION CLAUSE

The Union, having committed itself to achieving better working conditions for all Employees in the nursing home industry, represents that it intends to provide the same conditions for workers in all nursing homes with which it has collective bargaining agreements.

In the event the Union enters into any collective bargaining agreement, memorandum of agreement or stipulation of agreement on or after June 4, 2004 with a proprietary nursing home in New York City which provides for more favorable economic terms and conditions to the Employer than those contained herein, such more favorable terms and conditions shall automatically be applicable to the Employers, except that this provision shall not apply:

to an initial collective bargaining agreement with an Employer;

to renewals of prior agreements where time to reach industry standards is provided;

to agreements with receivers;

to agreements with insolvent Employers; or

to agreements with Employers who, prior to entering into the current agreement, were non-parity facilities.

## 40. MANAGEMENT RIGHTS

The management of the nursing home and direction and control of the property and work force shall remain with the Employer. The rights herein described shall include but not be limited to: the right to hire, layoff, discharge for just cause, in case of emergency to require that duties other than those normally assigned be performed, except that "emergencies" shall not exist for longer than one (1) day; to make reasonable working rules and regulations of procedure and conduct; and to determine work shifts, provided, however, that the exercise of these rights is to be consistent with the terms and conditions of this Agreement and is not to be used so as to discriminate against any person by reason of Union membership.

## 41. RESIGNATION FROM THE ASSOCIATION

Employers who resign from the Association shall nevertheless be bound by the terms of this Agreement for the balance of the term hereof.

## 42. DURATION

A. The parties agree that this Agreement shall be effective June 1, 2004 through April 30, 2008, except for such provisions of this Agreement with earlier effective dates. It is specifically understood and agreed that no party hereto shall engage in economic action, including strikes or lockouts, against the other for a period of forty (40) days after April 30, 2008. On or after the forty (40) day period mentioned herein, neither party shall take economic action in connection with negotiations except upon ten (10) days' notice.

B. This Agreement shall continue in effect during negotiations even though such negotiations extend beyond the expiration date for such reasonable length of time thereafter as may be required for the negotiation of a new agreement. Following the expiration date, either party may terminate the Agreement upon twenty four (24) hours' notice. Neither party shall take economic action in connection with such negotiations except upon ten (10) days notice. Any wage increases included in such Agreement shall be retroactive to the date of expiration.

Case 1:07-cv-08652-PAC    Document 1-2    Filed 10/05/2007    Page 21 of 49

## 43. RATIFICATION

This Agreement is subject to ratification by the Union and the Association.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their proper officers as of the day and year first above written.

**1199SEIU NEW YORK'S HEALTH & HUMAN SERVICE UNION, AFL-CIO**

By: _/s/ Dennis Rivera_

     Dennis Rivera
     President

**GREATER NEW YORK HEALTH CARE FACILITIES ASSOCIATION**

By: _/s/ John Chobor_

     John Chobor
     Executive Director

## SCHEDULE A

### Greater New York Facilities

1. CATON PARK
2. CLIFFSIDE
3. FAIRVIEW
4. FAR ROCKAWAY NURSING HOME
5. FLORENCE NIGHTINGALE
6. GREENPARK
7. HILLSIDE
8. HOLLIS PARK
9. HUNTINGTON HILLS
10. LILY POND
11. LITTLE NECK
12. MANHATTANVILLE
13. NEW GLEN OAKS
14. NEW VANDERBILT
15. NORTHERN MANHATTAN
16. PARK GARDENS
17. QUEENS NASSAU
18. RIVER MANOR
19. SANDS POINT
20. SEA CREST
21. SHEEPSHEAD
22. SHORE VIEW
23. UNION PLAZA
24. VERRAZANO
25. WOODCREST
26. WORKMEN'S CIRCLE

## SCHEDULE B* — MINIMUM RATES OF PAY

### MINIMUM RATES OF PAY

| CLASSIFICATION | Hourly Rate 4% 6/1/83 | Weekly Rate 4% 6/1/83 | Hourly Rate 6/1/84 | Weekly Rate 6/1/84 | Hourly Rate 3% 12/1/05 | Weekly Rate 3% 12/1/05 | Hourly Rate 3% 12/1/05 | Weekly Rate 12/1/05 | Hourly Rate 7/1/07 | Weekly Rate 7/1/07 |
|---|---|---|---|---|---|---|---|---|---|---|
| Certified Nursing Aide | $14.08 | $549.33 | $14.44 | $524.00 | $14.01 | $540.54 | $15.30 | $556.78 | $15.82 | $573.46 |
| Dietary Aide | $14.05 | $549.51 | $14.44 | $524.00 | $14.01 | $540.54 | $15.30 | $556.78 | $15.82 | $573.46 |
| Laundry Aide | $14.08 | $549.51 | $14.44 | $524.00 | $14.01 | $548.54 | $15.30 | $556.78 | $15.82 | $573.46 |
| Housekeeping Aide, Maid/Porter | $14.08 | $549.51 | $14.44 | $524.00 | $14.01 | $548.54 | $15.30 | $556.78 | $15.82 | $573.46 |
| Head Porter/Housekeeper | $14.52 | $526.44 | $14.96 | $542.23 | $15.41 | $558.50 | $15.87 | $575.26 | $16.35 | $592.52 |
| Gardener | $15.35 | $556.43 | $15.87 | $573.12 | $16.20 | $590.31 | $16.77 | $606.80 | $17.28 | $626.26 |
| Fireman, Handyman | $14.46 | $523.74 | $14.88 | $539.45 | $15.33 | $555.63 | $15.78 | $572.30 | $16.26 | $589.47 |
| Maintenance | $15.28 | $553.74 | $15.72 | $570.36 | $16.21 | $587.46 | $16.69 | $605.08 | $17.19 | $623.23 |
| Painter | $15.96 | $578.56 | $16.44 | $595.91 | $16.93 | $613.79 | $17.44 | $632.20 | $17.96 | $651.17 |
| Window Cleaner | $15.81 | $544.12 | $15.40 | $560.44 | $13.92 | $577.25 | $17.44 | $594.57 | $18.05 | $612.40 |
| Engineer - Lic. ** | $15.44 | $561.82 | $15.94 | $577.68 | $16.42 | $595.22 | $16.91 | $613.08 | $17.42 | $631.46 |
| Dietary Aide, Kit. Aide, Dishwasher | $14.00 | $548.51 | $14.48 | $524.00 | $14.81 | $544.54 | $15.30 | $556.78 | $15.82 | $573.46 |
| Second Cook** | | | | | | | | | | |
| First Cook** | | | | | | | | | | |
| -40 beds | $14.51 | $525.98 | $14.94 | $541.74 | $15.56 | $557.99 | $13.85 | $539.52 | $16.33 | $591.97 |
| 41-99 beds | $14.82 | $525.05 | $14.94 | $541.01 | $15.37 | $567.99 | $15.65 | $547.73 | $16.09 | $591.97 |
| 100-119 beds | $14.67 | $531.62 | $15.27 | $547.57 | $15.74 | $564.00 | $16.03 | $588.92 | $16.60 | $604.73 |
| 120 - up beds | $14.62 | $537.37 | $15.56 | $548.00 | $15.85 | $541.99 | $16.54 | $599.45 | $17.03 | $617.43 |
| Recreation Worker | $19.20 | $554.21 | $15.75 | $570.04 | $16.22 | $547.91 | $16.71 | $605.61 | $17.21 | $623.70 |

### MINIMUM RATES OF PAY

| CLASSIFICATION | Hourly Rate 4% 6/1/83 | Weekly Rate 4% 6/1/83 | Hourly Rate 6/1/84 | Weekly Rate 6/1/84 | Hourly Rate 3% 12/1/05 | Weekly Rate 3% 12/1/05 | Hourly Rate 3% 12/1/05 | Weekly Rate 12/1/06 | Hourly Rate 7/1/07 | Weekly Rate 7/1/07 |
|---|---|---|---|---|---|---|---|---|---|---|
| Asst. Chef** | $15.32 | $555.38 | $15.70 | $572.04 | $16.25 | $589.28 | $16.74 | $606.40 | $17.24 | $625.00 |
| Chef** | $16.87 | $562.32 | $16.55 | $608.01 | $17.05 | $610.07 | $17.58 | $638.55 | $18.09 | $655.65 |
| Telephone Operator, Receptionist | $14.53 | $527.97 | $15.00 | $543.81 | $15.45 | $560.12 | $15.97 | $576.92 | $16.39 | $594.23 |
| Clerks, all Depts. | $14.51 | $526.05 | $14.95 | $541.53 | $15.48 | $558.09 | $15.86 | $574.63 | $16.33 | $592.87 |
| Assistant Dietitian | $14.68 | $532.29 | $15.12 | $548.17 | $15.58 | $564.62 | $16.04 | $581.58 | $16.52 | $599.01 |
| Dietitian (Non-Supv.) | $15.10 | $548.50 | $15.81 | $565.99 | $16.00 | $582.97 | $16.54 | $600.48 | $17.00 | $618.47 |
| Recreation Worker, Aide | $14.96 | $509.51 | $14.44 | $524.00 | $14.91 | $548.54 | $15.30 | $556.78 | $15.82 | $573.46 |
| Recreation Worker | | | | | | | | | | |
| w/Assoc. Degree or | | | | | | | | | | |
| 3 years experience | $14.30 | $520.67 | $14.70 | $534.29 | $15.24 | $552.38 | $15.70 | $569.95 | $16.17 | $586.02 |
| Social Worker Aide*** | $14.06 | $509.51 | $14.44 | $524.00 | $14.97 | $540.54 | $15.30 | $556.78 | $15.82 | $573.46 |
| Social Worker Asst. | | | | | | | | | | |
| Member of the Nat'l Assoc. | | | | | | | | | | |
| of Social Workers | $14.36 | $520.87 | $14.78 | $536.29 | $15.24 | $552.38 | $15.70 | $564.95 | $16.17 | $596.92 |

* Nothing contained in this Schedule B is intended to expand existing bargaining units. Such expansion may occur upon the Union's demonstration through a card count by the Impartial Chairman that it represents a majority of Employees heretofore unrepresented by if employed by any Employer member of the Association. Upon such a showing, such Employees shall thereafter be covered by all the terms and conditions of the collective bargaining agreement.

The minimum rates of pay for these job classifications are subject to adjustment as a result of an interest arbitration pending before the Impartial Chairman.

The fringe benefits applicable to this job classification shall be those set forth in this Agreement.

** The minimum hourly rate shall in no case be less than the weekly minimums are the minimum rates applicable to full-timers in the appropriate classifications.

*** The part-time minimum hourly rate shall be the weekly rate divided by the full-time work week.

Hourly rates are provided for reference purposes only. The parties agree the weekly minimums are the minimum rates applicable to full-timers in the appropriate classifications.

Case 1:07-cv-08652-PAC   Document 1-2   Filed 10/05/2007   Page 23 of 49

## SCHEDULE C

V=Vacation Day    H=Holiday    S=Sick Day    P=Personal Day
I=Other Paid Leave    O=Other

SCHEDULE PERIOD:
MONTH:          DATE:          YEAR:



## SCHEDULE C

V=Vacation Day    H=Holiday    S=Sick Day    P=Personal Day
I=Other Paid Leave    O=Other

SCHEDULE PERIOD:
MONTH:          DATE:          YEAR:

## ATTACHMENT "A"

Mr. John Chobor, Executive Director
New York Health Care Facilities Association
21 Penn Plaza
360 West 31st Street, 5th Floor
New York, New York 10001

Re:    Quality of Work Issues
       Contract and Benefits Administration Program

Dear Mr. Chobor:

This letter is delivered to you simultaneously with the execution of the Collective Bargaining Agreement, and sets forth certain agreements reached by the parties in the 2002-2005 and the 2004-2008 Memorandum of Agreement.

Quality of Work Issues: The Association and the Union have agreed to continue discussions concerning certain issues raised during negotiations. These issues are: (1) mandatory overtime, (2) patient lift transfers and, (3) quality of care issues as set forth in the Quality Care Committee attachment to this letter. The parties may refer these issues to interest based bargaining with the assistance of the Worker Participation Fund.

Contract Administrators: The Association and the Union shall implement an Employee release time program to provide for Labor Relations and benefits administration. This program shall be effective for the period January 1, 2005 – April 30, 2008. The release of Contract Administrators shall not unreasonably interfere with the operations of the Employer. The cost of the Contract Administrators Program shall be paid through the WPF.

Very truly yours,

/s/ DENNIS RIVERA

Dennis Rivera

Accepted:

GREATER NEW YORK HEALTH
CARE FACILITIES ASSOCIATION

/s/ JOHN CHOBOR

John Chobor

## ATTACHMENT "B"

### QUALITY CARE COMMITTEE

Committee Objectives:

The Association and the Union have agreed to discuss the establishment of a Quality Care Committee to study and review nursing care practices, including job assignments and duties of bargaining unit members, in Nursing Homes leading to recommendations to the Association and 1199 Nursing Home Division leadership in nursing care practices, including staffing, with the goal of providing appropriate care for each resident in accordance with New York State standards. This committee shall also consider professional and technical practice issues.

Possible Project Structure, Roles & Responsibilities

Quality Care Committee (QCC) consisting of one nursing department bargaining unit member and one management representative from each Association nursing home chosen by each of the respective parties will:

- Screen and select expert(s) to conduct research
- Assist in gathering of patient care data, including current staffing patterns, and job descriptions at each of the Association homes
- Review and evaluate data collected
- Develop recommendations to the Association and 1199 leadership
- Use interest based problem solving as basis for discussions
- Provide regular updates to the leadership of Association and 1199 of progress
- Maintain records of their meetings
- Meet one day per month or as determined by the Committee
- In order to expedite the work of the QCC, subcommittees may be established to study different facets of this issue

Quality Care Committee Oversight Committee consisting of two (2) union and two (2) management leadership representatives will:

- Oversee this effort including finalizing the process

- Identify and clear up any roadblocks

- Represent committee between meetings as needed

- Advise and direct the consultants (from the Labor Management Project and any additional external experts)

- Monitor the budget

- Review the recommendations of the QCC and determine how to proceed to effectuate those recommendations that are agreed upon

- Will meet monthly or as determined by the Committee

Labor Management Project staff will:

- Facilitate meetings of the Quality Care Committee, Oversight Committee

- Provide orientation and training, as required, for the committee on the interest based problem solving process

- Report to the Oversight Committee

Research Consultant(s)/Expert(s) will (list to be completed by the QCC):

- Identify standards in nursing home nursing care practices

- Assist the committee in analyzing the data gathered

- Assist the Committee in preparing a report on data and analysis to present to Association and 1199 leadership

Timeframe: the goal of the QCC will be to deliver recommendations within one year from the initial meeting of the committee.

Boundaries: The parties recognize that

- Some of the recommendations may be outside the control of the Nursing Home Administrators and will suggest legislative intervention.

- There are a combination of factors that influence nursing practices and staffing such as resident acuity, technology, different types of care, unit size and geography, qualifications of staff, standards of practice, staff mix, productivity, nature of resident care provided and financial resources.

Nothing contained herein shall be subject to the Grievance and Arbitration provisions of the Contract.

ATTACHMENT "C"

Mr. John Chobor, Executive Director
Greater New York Health Care
Facilities Association
21 Penn Plaza
360 West 31st Street, 5th Floor
New York, New York 10001

Side letter re scholarships

Dear Mr. Chobor:

The parties will discuss the implementation of paragraph 29 of the 1997-2002 Agreement concerning scholarships, which provided as follows:

During April 1, 1984 through March 31, 1985 the Employer association shall provide at its sole expense in all bargaining units, i.e., paraprofessional, LPN and RN a total of twenty-five (25) scholarships in the amount of one thousand dollars ($1,000.00) each. During each year thereafter the dollar amount of such scholarships shall be increased to one thousand two hundred fifty dollars ($1,250.00) each. The scholarships shall be awarded to children of bargaining unit employees selected by a committee, consisting of Dennis Rivera, John Chobor and Martin F. Scheinman, or their respective designees.

Very truly yours,

/s/ DENNIS RIVERA

Dennis Rivera

Accepted:

GREATER NEW YORK HEALTH
CARE FACILITIES ASSOCIATION

/s/ JOHN CHOBOR

John Chobor

## ATTACHMENT "D"

June 4, 2004

Mr. Jay Sackman
1199SEIU
310 West 43rd Street
New York, NY 10036

Dear Mr. Sackman:

This letter is delivered simultaneously with the execution of the MOA between the Association and the Union covering the period June 1, 2004 through April 30, 2008, and has the same force and effect as if set forth therein.

1199SEIU Greater New York Benefit Fund ("BF") Cost Savings Initiatives

This sets forth a list of cost savings initiatives identified during the course of negotiations that, if aggressively and effectively implemented should achieve the cost savings commitments in the MOA of $22 million over the life of the MOA and an annual and recurring savings rate of at least $4.4 million by the end of the MOA. Moreover, the Union and the Association have agreed that the Trustees and the Executive Director of the BF shall aggressively seek additional ways to reduce the cost of providing benefits while maintaining the integrity of the benefits received by the Union Members.

As it is the intention of the parties to maintain and improve the BF's programs, these and other adjustments are needed to preserve the resources of the BF to provide its comprehensive health coverage in the face of rising health care costs. Thus, without limiting the potential cost savings approaches the Trustees and Executive Director of the BF should pursue, they are directed to implement the following programs, policies and plan changes.

A Cost Savings Committee ("Committee") consisting of Dennis Rivera and John Chobor, or their designees, shall be established. The functions of the Committee include establishing a base line for measurement, setting benchmarks and milestones, measuring the results of and monitoring the effect of the savings program referred to above. The Committee shall also seek additional ways to improve the cost efficiency of the Benefit Fund.

1.  Mandatory Mail Order for Maintenance Prescription Drugs

This Program requires active and retired members who use certain prescription drugs on a regular and long term basis to have those prescriptions filled, by mail, through the BF pharmacy benefit manager. This program will relieve some members of the need to constantly reorder the drug and to travel unnecessarily. It will help the BF save resources by purchasing in bulk.

2.  Mandatory Medicare risk HMO

A mandatory Medicare risk HMO for those in the greater New York coverage area. The program will provide full hospital, medical, drug, eyeglasses and a limited dental benefit. The BF shall implement the program as soon as practicable and shall enroll members as soon as the new HMO benefit provider is available. All eligible retirees shall enroll no later than January 1, 2005, except for hardship exemptions.

The BF shall immediately investigate the availability of a similar program for retirees living in Florida.

3.  Medical Management of Patient Care Services

As recommended by the actuarial consultants to the BF, in order to improve the quality and efficiency of the radiology, laboratory, and medical management of patient care services, the BF Trustees shall (a) promptly contract with a vendor network as the sole provider to BF participants and beneficiaries of radiology services and a similar provider for laboratory services and (b) implement a program of improved medical management of patient care services. The radiology and laboratory vendor network provider agreements shall be effective no later than October 1, 2004 and the improved medical management program shall be implemented as soon as practicable.

4.  Pharmacy Benefits Manager

The BF shall rebid the contract for a pharmacy benefits manager in order to achieve the most favorable terms available in the marketplace.

5.  Coordination of Benefits

The BF shall redouble its efforts to strongly and vigorously enforce its coordination of benefits policy to ensure that all alternative sources of coverage are applied to offset and reduce the cost of providing benefits.

**6.    Full Formulary program**

The mandatory full formulary program, which is administered through the BF, by its pharmacy benefit manager shall, effective January 1, 2005, not cover proton pump inhibitors (e.g., Nexium), except where there is a diagnosis of disease that requires such prescription drugs for effective treatment. For other conditions, members have available effective over the counter medications (e.g., Prilosec OTC).

**Medical Reimbursement Schedule**

At the request of the Executive Director of the BF, Dennis Rivera and John Chobor, or their designees, shall meet to consider the necessity and viability of improving the medical reimbursement schedule. The factors that they shall consider may include, but are not limited to, the need for such increases, the excess of projected savings over the target set forth at Paragraph 4 of the MOA (if any), and the availability of Pension Fund diversion dollars. If they do not reach agreement, the matter shall not be arbitrable, however, the medical reimbursement schedule shall be increased by the value of projected savings in excess of the target set forth at Paragraph 4 of the MOA, if any.

Very truly yours,

/s/ JOHN CHOBOR

John Chobor, Executive Director
Greater New York Health
Care Facilities Association, Inc.


AGREED:

1199SEIU, New York's Health
& Human Service Union

/s/ JAY SACKMAN

Jay Sackman
Executive Vice President

---

**ATTACHMENT "E"**

June 4, 2004

Mr. Jay Sackman
1199SEIU
310 West 43rd Street
New York, NY 10036

Dear Mr. Sackman:

This letter is delivered simultaneously with the execution of the MOA between the Association and the Union covering the period June 1, 2004-April 30, 2008, and has the same force and effect as if set forth therein.

With respect to the Reimbursement Clause (Article 38) of the CBA, it is understood as follows:

1. There shall be no Association-wide claim of inadequate reimbursement.

2. Prior to any Employer exercising any rights it may have under Article 38 in the case of inadequate reimbursement, it must first submit its claim of inadequate reimbursement to the Labor Management Reimbursement Review Committee comprised of Union members Dennis Rivera, Jay Sackman, Dan Ratner, Irwin Bluestein and Employer members John Chobor, Mark Sussman, Morris Tuchman, Eric Simon and Impartial Chairman Martin Scheinman. A quorum of two (2) Union members and two (2) Employer members of the Committee and the Impartial Chairman shall be required for the conduct of the Committee's business. No Employer may implement any lesser term or condition of employment, nor may any Employer's claim be submitted for adjudication by the Impartial Chairman, without having first been submitted to the committee.

3. The Committee shall have full access to cost reports, rate sheets, and other documents, books and records as it may require to evaluate the Employer's claim of inadequate reimbursement.

4. The fourth "Whereas" provision in the CBA is deleted as it is no longer relevant.

Very truly yours,

/s/ JOHN CHOBOR
_____
John Chobor, Executive Director
Greater New York Health
Care Facilities Association, Inc.


AGREED:

1199SEIU, New York's Health
& Human Service Union

/s/ JAY SACKMAN
_____
Jay Sackman
Executive Vice President

## ATTACHMENT "F"

June 4, 2004

Mr. Jay Sackman
1199SEIU
310 West 43rd Street
New York, NY 10036

Dear Mr. Sackman:

This letter is delivered simultaneously with the execution of the MOA between the Association and the Union covering the period June 1, 2004 through April 30, 2008, and has the same force and effect as if set forth therein.

It is agreed that the Pension Fund contribution moratorium set forth in paragraph B.2 of the MOA shall be extended for facilities contributing less than five and eighty-four one-hundredths percent (5.84%) to the Pension Fund for the period of time necessary to realize the dollar equivalent of the six month moratorium in place for facilities that contribute five and eighty-four one-hundredths percent (5.84%).

Sincerely yours,

/s/ JOHN CHOBOR
_____
John Chobor, Executive Director
Greater New York Health
Care Facilities Association, Inc.


AGREED:

1199SEIU, New York's Health
& Human Service Union

/s/ JAY SACKMAN
_____
Jay Sackman
Executive Vice President

## MEMORANDUM OF AGREEMENT

AGREEMENT entered into this _____ day of August , 2005, by and between 1199SEIU New York's Health & Human Service Union ("Union") and Oceanview Care Center (the "Employer").

### W I T N E S S E T H:

WHEREAS, the parties desire to enter into a collective bargaining agreement on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual promises herein contained, the parties hereto agree as follows:

1.   All the terms and conditions of the parties previous Agreement expiring on April 30, 2005 shall continue in full force and effect with the following modifications:

a.   The parties agree to the same terms and conditions as are contained in the Memorandum of Agreement between the Union and the Greater New York Association (the "Association"), covering the period June 1, 2004 through April 30, 2008, a copy of which is attached hereto as Exhibit "A" with the following exception:

i.   Number 3 (A) contained in the Exhibit "A" shall be modified as follows:

a.   December 1, 2005 – 3%

b.   July 1, 2006 – 3%

c.   July 1, 2007 – 3%

d.   December 1, 2007 – 3%

SEP 14 2005

2. Any complaints, disputes, controversies or grievances arising between the parties hereto involving questions of interpretation or application of any clause of the aforesaid CBA, as reopened, extended and renewed by this Agreement, or any acts, conduct or relations between the parties hereto, directly or indirectly, which shall not have been adjusted by the parties shall be submitted to arbitration before the Impartial Chairman hereunder, who shall be the person serving as Impartial Chairman under Exhibit "A."

This Agreement is subject to ratification by the Union.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

1199SEIU NEW YORK'S HEALTH
& HUMAN SERVICE UNION

By:

OCEANVIEW CARE CENTER

By: _____    9/6/05

May. 23. 2007  9:50AM

No. 3798   P. 4

**EXHIBIT A**

# MEMORANDUM OF AGREEMENT

Between

## NEW YORK'S HEALTH AND HUMAN SERVICE UNION
## 1199/SEIU, AFL-CIO ("1199" OR "Union")

and

## THE GREATER NEW YORK
## HEALTH CARE FACILITIES ASSOCIATION, INC.
## ("Association")

This Memorandum of Agreement ("MOA") shall apply to the collective bargaining agreements currently in effect between the Union and the Association ("CBAs").

1. <u>Continuation of Existing Terms</u>: All of the terms and conditions of the CBAs shall remain in full force and effect except as expressly modified in this MOA (the "new agreements").

2. <u>Duration</u>: The term of the new agreements shall be from June 1, 2004 - April 30, 2008.

3. <u>General Wage Increases and Increases to Minimum Rates</u>:

A. Wage Increases:

1. June 1, 2004 - 3%.

2. December 1, 2005 - 3%.

3. December 1, 2006 - 3%.

4. July 1, 2007 - 3%.

The above wage increases shall be compounded and added to the minimum rates set forth in Schedule B of the CBAs. For non-parity facilities the wage increases shall be compounded on the minimum rates set forth in Schedule B of the CBAs and shall be added to the minimum rates at such non-parity facilities.

May. 23. 2007  9:50AM                                                    No. 3798    P. 6

B.  LPN and RN Minimums and Experience Steps:

The LPN minimum shall be adjusted to $20.24 per hour effective June 1, 2004.

The parties will engage in bargaining with respect to RN rates and experience steps. If the parties are unable to reach an agreement by September 30, 2004, the matter will be submitted to interest arbitration.

4.  Funds Contributions and Benefits:

A.  Benefit Fund:

1.  The parties recognize that the Employers in the long-term care industry who applied for grants through the Greater New York Consortium shall contribute $15 million dollars to the Benefit Fund ("BF") from the proceeds received by Employers through the Supplemental Quality Care Grant and related monies in the following manner:

The aforesaid $15 million dollars will be contributed to the Benefit Fund within 10 days from the receipt of such amount by the Employers.

Each Employer receiving Quality Care Grant and/or related monies shall contribute its proportionate share of the aforesaid $15 million dollars by applying the same percentage as its grant represents to the overall grant dollars received (e.g., if the total amount of grant dollars received by Consortium members is $40 million dollars and the Employer receives $1 million dollars it shall contribute 1/40th of the $15 million dollars.

2.  Legal Services:  The 1115 Prepaid Legal Services Fund ("LF") shall be merged into the BF effective as of January 1, 2005 Legal Services benefits as developed by the BF trustees shall thereafter be available to participants in the BF eligible for such benefits. There shall be no additional Employer contributions to the BF

to fund the legal services benefits.  The $8 per month contribution made by certain Employers to the LF shall cease effective May 31, 2004.

4.  A program of savings initiatives shall be implemented that produces savings of $22 million over the term of this MOA and achieves a "going out" annual savings rate of at least $4 million by the end of the MOA.  (See side letter.)

5.  A cost Savings Committee ("Committee") consisting of Dennis Rivera and John Chobor, or their designees shall be established.  The functions of the Committee shall include establishing a base line for measurement, setting benchmarks and milestones, measuring the results of and monitoring the effect of the savings initiatives.  The Committee shall also seek additional ways to improve the cost efficiency of the BF.

Effective May 1, 2005, and every twelve months thereafter, a consultant retained by the Committee shall determine if the anticipated savings are being achieved.  In the event of a shortfall John Chobor and Dennis Rivera, or their designees shall decide whether to direct a diversion from the BF to the BF to make up such shortfall.

6.  As part of cost savings, the parties recognize that the Union's Delegates will play a pivotal role in educating the Union membership in understanding the cost savings program, in helping to prevent fraud and abuse in the Funds, and in understanding the CBAs and the new agreements and the collective bargaining process.  In this regard, the Delegates will be released for up to five (5) days with pay over the term of this agreement for intensive training in these areas.  The release of Delegates shall not unreasonably interfere with the operations of the Employer. The Employers will be reimbursed from the

Worker Participation Fund for the cost of release time (approximately $1,000 per Delegate).

7. It is the agreement of the Association, the Union and the Funds to implement, wherever possible, electronic transmission of dues remittances, Fund contributions and reports and to streamline reporting requirements. The Association, the Union and the Funds will meet to discuss the most practicable implementation program to achieve this objective.

B.  Pension Fund:

2.  Pension Fund Diversions:

The particulars of our agreement outlined below are as follows:

### June 1, 2004 - May 31, 2005:

(1)  Active employees who retire on or after January 1, 2005 shall receive a pension based on an accrual rate of $37 per month to a maximum pension of $925 per month ($37 x 25 years).

The Employers shall make 3 months of contributions to the Pension Fund (March, April and May 2005).

3 months of Pension Fund contributions shall be diverted to the Benefit Fund (September and October 2004 and February 2005).

### June 1, 2005 - May 31, 2006:

No contributions shall be required to be made to the Pension Fund for the months of (June, July, August, November and December 2004 and January 2005).

The Employers shall make 10 months of contributions to the Pension Fund (August 2005 through May 2006).

2 months of Pension Fund contributions shall be diverted to the Benefit Fund (June and July 2005).

### June 1, 2006 – May 31, 2007:

The Employers shall make 10 months of contributions to the Pension Fund (August 2006 through May 2007).

2 months of Pension Fund contributions shall be diverted to the Benefit Fund (June and July 2006).

An additional 1 month of Pension Fund contributions (a 13th month) shall be contributed to the Pension Fund or diverted to the Benefit Fund as determined by the parties according to the economic needs of the Funds (October 2006).

### June 1, 2007 – May 31, 2008:

The Employers shall make 10 months of contributions to the Pension Fund (August 2007 through May 2008).

2 months of Pension Fund contributions shall be diverted to the Benefit Fund (June and July 2007).

An additional 1 month of Pension Fund contributions (a 13th month) shall be contributed to the Pension Fund or diverted to the Benefit Fund as determined by the parties according to the economic needs of the Funds (October 2007).

C. Job Security Fund:

The diversion currently in effect from the 1199 Greater New York Job Security Fund ("JSF") to the 1199 Greater New York Worker Participation Fund ("WPF") shall continue through May 31, 2005. Effective June 1, 2005, Employers shall contribute to the JSF at the rate of one-quarter (.25%) percent of gross payroll.

D.   Worker Participation Fund:

Effective June 1, 2005 Employers shall commence contributing to the WPF at the rate of one-quarter percent (".25%") of gross payroll.

4.   Job Security Date:  Employees employed by an Employer prior to January 1, 2000 shall be protected against layoff. Unprotected employees laid off are eligible for benefits from the JSF.

In the event an Employer raises a substantial issue over the number of its protected bargaining unit employees (e.g., more than 75% of the employees in a department or area are protected) the issue may be referred to a Committee made up of Dennis Rivera, the President of the Union, and John Chobor, the Executive Director of the Association, or their designee, but shall not be subject to its arbitration process.

5.   Eliminating slotting:  The parties shall establish an industry Committee to address systemic abuses regarding the use of non-slotted employees.

Article 11.F. of the CBAs is deleted from the new agreements.

6.   Parity/Industry Standards:  Within ten (10) days after ratification of the new agreements, the parties shall meet to determine the wage and other adjustments to be implemented by each non-parity Employer. Within ten (10) days after receipt by each such non-parity Employer of Supplemental Quality Care Grant monies or related monies from the State of New York, the agreed upon wage and other parity adjustments shall be made by each such non-parity Employer. In the event the parties cannot agree within 60 days thereafter as to the adjustments to be made, the matter shall be submitted to the Impartial Chairman for

final adjudication by him, such adjudication to be completed within 60 days. It is understood that all grant monies or related monies received above and beyond the $15,000,000 to be contributed to the Benefit Fund shall be spent on the wage and other parity adjustments. Employers pro rata share (as described in 4.A above) of the

The foregoing shall satisfy the non-parity employers' obligations under the provisions of Article 37 of the CBAs during the life of the new agreements.

7. <u>Contract Administrators:</u> The Association and the Union shall implement an employee release time program to provide for Labor Relations and benefits administration. This Program shall be effective for the period January 1, 2005 - April 30, 2008. The release of Contract Administrators shall not unreasonably interfere with the operations of the Employer. The cost of the Contract Administrators Program shall be paid through the WPF.

8. <u>Employment Service:</u> Each Employer shall notify the 1199 Employment Service of all vacancies not filled from within its facility. The Employment Service shall have three (3) working days to refer qualified applicants to the Employer before the Employer may hire from other sources. The Employer retains the right to hire or decline to hire any applicant referred by the Employment Service in its sole discretion.

9. <u>Technical and Professional Employees:</u> The parties shall discuss the appropriate rates and unit placement of employees in technical and professional classifications in the long term care industry. In the event that these discussions do not result in agreement by March 1, 2005, the rates, classifications, and unit placement of such employees shall be submitted to the Impartial Chairman for binding interest arbitration.

10. <u>Impartial Chairman:</u> The parties reappoint Martin F. Scheinman for a new five (5) year term as Impartial Chairman, subject to the provisions of Article 9.B of the CBAs.

11. Disputes:   Any dispute as to the interpretation or
application of this MOA shall be submitted to arbitration
before the Impartial Chairman.

   This Agreement is subject to ratification by the Union
and the Association.

NEW YORK'S HEALTH &
HUMAN SERVICE UNION,
1199/SEIU, AFL-CIO

_____
Jay Sackman,
Executive Vice President

GREATER NEW YORK
HEALTH CARE FACILITIES
ASSOCIATION, INC.

_____
Jichn Bloor,
Executive Director

## SCHEDULE A

### Greater New York Facilities

1. Caton Park
2. Cliffside
3. Far Rockaway Care Center
4. Florence Nightingale
5. Friedwald Center
6. Green Park
7. Hillside Manor
8. Hollis Park
9. Huntington Hills
10. Little Neck
11. Manhattanville
12. New Glen Oaks
13. New Vanderbilt
14. Park Gardens
15. River Manor
16. Sands Point
17. Sea Crest
18. Shore View
19. Union Plaza
20. Woodcrest
21. Workmen's Circle

June 4, 2005

Mr. Jay Sackman.
1199 SEIU
310 West 43rd Street
New York, NY 10036

Dear Mr. Sackman:

This letter is delivered simultaneously with the execution of the MOA between the Association and the Union covering the period June 1, 2004 through April 30, 2008, and has the same force and effect as if set forth therein.

## BF Cost Savings Initiatives

This sets forth a list of cost savings initiatives identified during the course of negotiations that, if aggressively and effectively implemented should achieve the cost savings commitments in the MOA of $22 million over the life of the MOA and an annual and recurring savings rate of at least $4.4 million by the end of the MOA. Moreover, the Union and the Association have agreed that the Trustees and the Executive Director of the BF shall aggressively seek additional ways to reduce the cost of providing benefits while maintaining the integrity of the benefits received by the Union Members.

As it is the intention of the parties to maintain and improve the BF's programs, these and other adjustments are needed to preserve the resources of the BF to provide its comprehensive health coverage in the face of rising health care costs. Thus, without limiting the potential cost savings approaches the Trustees and Executive Director of the BF should pursue, they are directed to implement the following programs, policies and plan changes.

A Cost Savings Committee ("Committee") consisting of Dennis Rivera and John Chobor, or their designees, shall be established. The functions of the Committee include establishing a base line for measurement, setting benchmarks and milestones, measuring the results of and monitoring the effect of the savings program referred to above. The Committee shall also seek additional ways to improve the cost efficiency of the Benefit Fund.

1. Mandatory Mail Order for Maintenance Prescription Drugs

This Program requires active and retired members who use certain prescription drugs on a regular and long term basis to have those prescriptions filled, by mail, through the BF pharmacy benefit manager. This program will relieve some members of the need to constantly reorder the drug and to travel unnecessarily. It will help the BF save resources by purchasing in bulk.

2. Mandatory Medicare risk HMO

A mandatory Medicare risk HMO for those in the greater New York coverage area. The program will provide full hospital, medical, drug, eyeglasses and a limited dental benefit. The BF shall implement the program as soon as practicable and shall enroll members as soon as the new HMO benefit provider is available. All eligible retirees shall enroll no later than January 1, 2005, except for hardship exemptions.

The BF shall immediately investigate the availability of a similar program for retirees living in Florida.

3. Medical Management of Patient Care Services

As recommended by the actuarial consultants to the BF, in order to improve the quality and efficiency of the radiology, laboratory, and medical management of patient care services, the BF Trustees shall (a) promptly contract with a vendor network as the sole provider to BF participants and beneficiaries of radiology services and a similar provider for laboratory services and (b) implement a program of improved medical management of patient care services. The radiology and laboratory vendor network provider agreements shall be effective no later than October 1, 2004 and the improved medical management program shall be implemented as soon as practicable.

4. Pharmacy Benefits Manager

The BF shall rebid the contract for a pharmacy benefits manager in order to achieve the most favorable terms available in the marketplace.

- 2 -

AGREED:

1199/SEIU, New York's Health
& Human Service Union

Jay Sackman
Executive Vice President

- 4 -

June 4, 2005

Mr. Jay Sackman
1199 SEIU
310 West 43rd Street
New York, NY 10036

Dear Mr. Sackman:

    This letter is delivered simultaneously with the execution of the MOA between the League and the Union covering the period June 1, 2004–April 30, 2008, and has the same force and effect as if set forth therein.

    With respect to the Reimbursement Clause (Article 38) of the CBAs, it is understood as follows:

    1.   There shall be no Association-wide claim of inadequate reimbursement.

    2.   Prior to any Employer exercising any rights it may have under Article 38 in the case of inadequate reimbursement, it must first submit its claim of inadequate reimbursement to the Labor Management Reimbursement Review Committee comprised of Union members Dennis Rivera, Jay Sackman, Dan Ratner, Irwin Bluestein and Employer members John Chobor, Mark Sussman, Morris Tuchman, Eric Simon and Impartial Chairman Martin Scheinman. A quorum of two Union members and two Employer members of the Committee and the Impartial Chairman shall be required for the conduct of the Committee's business. No Employer may implement any lesser term or condition of employment, nor may any Employer's claim be submitted for adjudication by the Impartial Chairman, without having first been submitted to the committee.

    3.   The Committee shall have full access to cost reports, rate sheets, and other documents, books and records as it may require to evaluate the Employer's claim of inadequate reimbursement.

    4.   The fourth Whereas provision in the CBAs is deleted as it is no longer relevant.

May. 23. 2007  9:51AM

Very truly yours,

GREATER NEW YORK RESIDENTIAL
HEALTH CARE FACILITIES
ASSOCIATION, INC.

BY: _____
John Sayer
Executive Director

AGREED:

NEW YORK'S HEALTH & HUMAN
SERVICE UNION, 1199/SEIU,
AFL-CIO

By: _____
Clay Sackman

No. 3798    P. 18

June 4, 2005

Mr. Jay Sackman
1199 SEIU
310 West 43rd Street
New York, NY 10036

Dear Mr. Sackman:

This letter is delivered simultaneously with the execution of the MOA between the Association and the Union covering the period June 1, 2004 through April 30, 2008, and, has the same force and effect as if set forth therein.

It is agreed that the Pension Fund contribution moratorium set forth in paragraph B.2 of the MOA shall be extended for facilities contributing less than 5.84% to the Pension Fund for the period of time necessary to realize the dollar equivalent of the six month moratorium in place for facilities that contribute 5.84%.

Sincerely yours,

John Cizbor
Executive Director
Greater New York Healthcare Facilities Association

Jay Sackman,
Executive Vice President
NEW YORK'S HEALTH &
HUMAN SERVICE UNION,
1199/SEIU/AFL-CIO

May. 23. 2007 9:52AM

No. 3798   P. 20

June 4, 2005

Mr. Jay Sackman
1199 SEIU
310 West 43rd Street
New York, NY 10036

Dear Mr. Sackman:

On behalf of the KM Labor Group, United Healthcare Facilities Association, and the Southern New York Labor Council Residential Health Care Facilities Association, we hereby adopt the MOA and side letters entered into this day between 1199 and the Greater New York Health Care Facilities Association.

Within five (5) days of the date of this letter each of our Employer groups will enter into a more formal agreement consistent with the foregoing.

Agreed:

NEW YORK'S HEALTH &
HUMAN SERVICE UNION,
1199/SEIU, AFL-CIO

Jay Sackman,
Executive Vice President

KM LABOR GROUP

Eric Simon, Esq.

SOUTHERN NEW YORK LABOR
COUNCIL

Neil Heyman
Executive Director

UNITED HEALTH CARE
FACILITIES ASSOCIATION

Morris Tuchman, Esq.

May. 23. 2007  9:52AM                                                No. 3798   P. 21

June 4, 2005

Mr. Jay Sackman
1199 SEIU
310 West 43rd Street
New York, NY 10036

Dear Mr. Sackman:

This letter is delivered simultaneously with the
collective bargaining agreement entered into this day
between our Association and 1199 covering the period June
1, 2004 through April 30, 2008 and has the same force and
effect as if set forth therein.

It is agreed that the "no frills" employees employed
in the "Association" bargaining unit shall receive the same
across-the-board percentage wage increases, on the same
dates as all other bargaining unit employees, said wage
increases to be compounded and added to the "no frills"
minimums.

Very truly yours,

UNITED HEALTH CARE
FACILITIES ASSOCIATION

By: _____
Morris Tuchman, Esq.

Agreed:

NEW YORK'S HEALTH & HUMAN
SERVICE UNION, 1199/SEIU,
AFL-CIO

By: _____
Jay Sackman

| Field | Value |
|---|---|
| Name of Institution | Oceanview Nursing Home |
| ID # | 307 |
| Telephone | (718) 471-6000 |
| Address Line #1 | 315 Beach 9th Street |
| Telefax | |
| Transmittal Created | AP-02/14/02 |
| Address Line #2 | |
| City, State, Zip | Far Rockaway, NY 11691 |
| Division | Nursing Home-Greater |
| Trustees' Approval | |
| Contract/Control # | 14402015 |
| Administrator/Owner | Abraham Seiman, Admin. |
| Organizer | Jay Sackman, Ex. V.P. |
| | 02/01/02     02/06/02 |
| Contract Signed/Received | 04/01/02-04/30/05 |
| Contract Effective Dates | |

**Eligibility Requirements**

| | |
|---|---|
| Blue Collar | 36.25 hour week |
| Part time | 282.75/qtr. |
| Full time | 444.08/qtr. |
| LPN/RN | 35.00 hour week |
| Part time | 273.00/qtr. |
| Full time | 428.75/qtr. |

**Transmittal Type:**

- [x] Renewal
- [ ] New, see below
- [ ] Termination
- [ ] Reinstatement

- [ ] Welcome
- [ ] DB-802

---

| Welfare | | Pension | | Education | | Child Care | (NEW) | Unusual Language |
|---|---|---|---|---|---|---|---|---|
| Effective | Rate | Effective | Rate | Effective | Rate | Effective | Rate | |
| 07/01/01 | Gross Wages 17.83% | 07/01/01 | Adj. Wages 5.84% | 07/01/01 | Adj. Wages 0.31% | 09/01/02 | Gross Wages 0.40% | Yes |
| | | | | | | 09/01/03 | 0.50% | |
| 10/01/02 | see comments | 04/01/02 | Gross Wages 5.84% | 05/01/02 | Gross Wages 0.50% | JSF | (NEW) | |
| | | | | | | | Gross Wages | |
| | | 10/01/02 | see comments | | | 10/01/02 | 0.25% | |

Job Titles:    (asterisk indicates new title)

Paraprofessionals-All full-time and regular part-time aides, orderlies, porters and maids, housekeeper, maintenance, dietary aides, asst. dietician, laundry workers, recreation workers, cook's helper, 1st cook, chef, roundsmen, .
Lpns and Rns.

Comments:

Contributions are based on *adjusted* gross wages: Para: 06/01/01, $419.18. LPNs: 06/01/01 $477.50 RNs: 06/01/01, $550.00.

Contributions are based on *actual* gross wages as follows: Welfare 07/01/01, Pension 04/01/02, Ed. 05/01/02, CCF 09/01/02, JSF 10/01/02.
Effective 10/01/02 if Welfare reserves fall below 3 months and actuary determines more needed to fund Pension, Trustees can increase contribution rates. If Trustees can not agree then Impartial Chairman will determine contibution rates.
Wage increases--05/01/02-3%,11/01/02-2%, 06/01/03-4%(added to minimums), 06/01/04-4%.
Effective 05/01/02 Employer shall make Funds contributions on behalf of slotted part-time employees who work 1 or 2 days per week so that such employees shall be able to receive part-timer benefits as determined by the Trustees.
Effective 01/01/02 new retirees shall receive some health benefits( there have not been any retiree health benefits since Sept.1, 1992).
Two new Funds- Child Care and Job Security. Contributions to go to new 1199 Greater Funds or existing 1199 Funds.